STANDARD ELEVATOR CO. et al. v. CRANE ELEVATOR CO. et al.[1]

(Circuit Court of Appeals, Seventh Circuit. October 5, 1896.)

No. 239.

1. PATENTS—ANTICIPATION—INVENTION—ELEVATORS.
    The Reynolds patent, No. 456,122, for an improvement in "means for controlling the operation of elevators," in which the characteristic feature is the use of two cables, the ends of which are attached to the car, whereby they counterbalance each other, and secure substantial steadiness and uniformity of force in the movement of the controlling device by the attendant, was not anticipated by the German patent to Lampe of June 3, 1882, or by the Baldwin patent, No. 456,107, both of which involved the use of only a single cord or cable. Reynolds was the first inventor of the improvement covered by his patent, and the same is valid as to both its claims. Woods, Circuit Judge, dissenting.

2. SAME—INFRINGEMENT.
    The Reynolds patent, No. 328,614, for combinations constituting improvements in hydraulic elevator apparatus, construed, and *held* valid, and infringed as to claims 2 and 4, and valid, but not infringed, as to claim 6.

3. SAME—EVIDENCE OF ASSIGNMENT—PATENT OFFICE RECORDS.
    A certified copy of the patent-office record of an assignment of a patent is prima facie proof that an original assignment was made in terms as shown in the record, that such instrument was subscribed as shown, that it was delivered, that the signature was the genuine signature of the assignee, and that the assignor had an assignable interest according to the purport of the instrument. City of New York v. American Cable Ry. Co., 9 C. C. A. 336, 60 Fed. 1016, and Paine v. Trask, 5 C. C. A. 497, 56 Fed. 233, disapproved. Woods, Circuit Judge, dissenting.

4. APPEAL—ASSIGNMENT OF ERROR.
    Where the proposition asserted in an assignment of error in a patent case is that the claims of two or more patents involved in the suit were valid, or that various claims of the two patents were infringed, such assignment must, in strictness, be overruled, if any one of the claims men-

---

[1] Rehearing denied November 10, 1896.

tioned is valid, or if any one of them is infringed. But, as the appellate court may reverse for an error not assigned, it may consider the questions involved as if the assignments had been distributive or severable.

**5. FINAL APPEALABLE DECREES—BILL OF REVIEW.**

A decree may be a final appealable decree, although, if no appeal be taken, a rehearing or bill of review would be available remedies in the court of original jurisdiction. Per Showalter, Circuit Judge.

**6. SAME—PATENT SUITS.**

In a patent case on the equity side the primary and essential contention relates to the ownership of the patent by complainant, the validity of the claims, and the infringement; and the final adjudication in favor of complainant on this contention is a perpetual injunction. Per Showalter, Circuit Judge.

**7. SAME—FINALITY OF PART OF DECREE.**

One portion of a decree may be final, and for that reason appealable, while the remainder may be interlocutory, and not appealable. Per Showalter, Circuit Judge.

**8. SAME—DECREES IN PATENT CASES.**

A decree adjudging that complainant is the owner of the patents sued on, that the claims of said patents, or some of them, are valid, and that defendants have infringed them, and granting a perpetual injunction, is appealable as a final decision upon the matters so adjudicated, under section 6 of the act establishing the circuit courts of appeal (Act March 3, 1891), and not as an interlocutory decree, under amended section 7 (Act Feb. 18, 1895), although the decree further refers the cause to a master for an accounting of profits, and expressly reserves the question of costs. Per Showalter, Circuit Judge (Woods, Circuit Judge, contra).

**9. SAME—AFFIRMANCE OF DECREE.**

There is no power in the court of appeals whereby its affirmance or approval on review of a decree of the circuit court can give a finality to that decree which it did not have when entered of record in the circuit court. Bissell Carpet-Sweeper Co. v. Goshen Sweeper Co., 19 C. C. A. 25, 72 Fed. 545, disapproved. Per Showalter and Woods, Circuit Judges, arguendo.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

On December 1, 1891, appellees filed their bill of complaint against appellants, alleging, among other matters not in controversy on this appeal, the issuance to one Reynolds of letters patent of the United States No. 317,202, No. 328,614, and No. 456,122, to one Baldwin of letters patent No. 248,908 and No. 456,107, and to one Moore of letters patent No. 309,865; that by assignment appellees had become owner of all the rights originally vested by force of said patents in said patentees; that appellants had infringed said patents, and each of them; and that "gains and profits to a large sum of money," "the full amount of which is unknown to" appellees, "had accrued to" appellants "from the use of" appellees' "exclusive rights aforesaid," whereby appellees were entitled to an accounting. They asked that an injunction and an accounting be adjudged in their favor.

After hearing upon the bill, answer, and replication, and proofs duly taken on the issue so made, and on March 12, 1895, a decree was made, and duly entered of record. As to letters patent numbered 317,202 and 309,865 the bill was, by this decree, dismissed for want of equity. As to letters patent numbered 248,908 and 456,107 the bill was dismissed without prejudice. As to claims 2, 4, and 6 of letters patent No. 328,614, there being no controversy touching the other claims of that patent, and as to the two claims of letters patent No. 456,122, the court found and decreed, without reserving any further consideration of that subject, that appellants had infringed. An injunction (without limitation in time, and without reservation on that matter) was therefore awarded. Appellees' claim to an accounting was not resisted on any ground other than noninfringement. The cause was therefore referred to a master to take proofs and report thereon "as to the complain-

ants' damages and as to the defendants' profits or savings resulting from the infringement by the defendants of said" five claims. The decree closes with the statement that "the question of costs in this cause is reserved till the entry of a final decree herein in this court." Appellants, after the entry of the decree, filed their petition in words following: "The defendants, Standard Elevator Company, Herbert A. Beidler, and Wm. II. Wells, Jr., jointly and severally pray an appeal to the United States circuit court of appeals for the Seventh circuit, from the order of his honor, Judge Jenkins, granting an injunction against the defendants under the 2d, 4th, and 6th claims of patent No. 328,614, granted to G. H. Reynolds, October 20, 1885, and patent No. 456,122, granted to G. H. Reynolds, July 14, 1891. We assign the following reasons for appeal, viz.: (1) The honorable judge erred in deciding that the construction of the defendants was an infringement of the 2d, 4th, and 6th claims of the Reynolds patent, No. 328,614, and of the claims of the Reynolds patent, No. 456,122. (2) The honorable judge erred in deciding that the said Reynolds patents, No. 328,614 and No. 456,122 are good and valid in law, notwithstanding the evidence adduced against them in the cause. (3) The honorable court erred in deciding that the complainants had made out and proved a valid title to the patent No. 328,614, mentioned aforesaid, or that such complainants had such property or right under such patents as would justify them in maintaining their bill of complaint. These defendants further pray that pending the determination of this appeal the injunction may be stayed upon the filing by such defendants with the clerk of this court of a supersedeas bond to the complainants in such sum as the court shall direct. They also pray such other and further order as may be deemed necessary to perfect this appeal and stay the injunction." The order of the court on this petition is in words following: "Now comes the Standard Elevator Company, by its solicitor, Frank T. Brown, and files its petition for appeal to the United States circuit court of appeals for the Seventh circuit, from the decree entered herein on the 12th day of March, 1895, and also files its assignment of errors. The court being advised in the premises, it is ordered, that said appeal be allowed upon the defendants filing an appeal bond in the sum of one thousand dollars, with surety to be approved by the court. It is further ordered that a supersedeas be granted upon said defendants filing a bond in the sum of fifteen thousand dollars, conditioned to abide and perform any final decree herein, if the appellant fail to make good its plea, with security to be approved by the court. It is further ordered that the proceedings under said decree be stayed for ten days." The bonds were thereupon made by the three defendants, they being named therein appellants and principals, with sureties as required by law. These bonds, each reciting that the "appeal" was "from the order granting such injunction," were duly approved, and the record brought to this court.

Section 692 of the Revised Statutes of the United States is in words following:

"Sec. 692. An appeal shall be allowed to the supreme court from all final decrees of any circuit court, or of any district court acting as a circuit court, in cases of equity, and of admiralty and maritime jurisdiction, where the matter in dispute, exclusive of costs, exceeds the sum or value of two thousand dollars, and the supreme court is required to receive, hear, and determine such appeals."

Section 6 of the act of March 3, 1891, for the organization of the federal courts of appeal, is in part in words following:

"Sec. 6. That the circuit court of appeals established by this act shall exercise appellate jurisdiction to review by appeal or by writ of error final decisions in the district courts and the existing circuit courts in all cases other than those provided for in the preceding section of this act, unless otherwise provided by law, and the judgments or decrees of the circuit courts of appeals shall be final in all cases in which the jurisdiction is dependent entirely upon the opposite parties to the suit or controversy being aliens and citizens of the United States or citizens of different states; also in all cases arising under the patent laws, under the revenue laws, and under the criminal laws and in admiralty cases, excepting that in every such subject within its ap-

pellate jurisdiction the circuit court of appeals at any time may certify to the supreme court of the United States any questions or propositions of law concerning which it desires the instruction of that court for its proper decision."

Section 7 of the last-named act, was amended February 18, 1895, to read as follows:

"That where, upon a hearing in equity in a district court or a circuit court, an injunction shall be granted, continued, refused, or dissolved by an interlocutory order or decree or an application to dissolve, an injunction shall be refused in a case in which an appeal from a final decree may be taken under the provisions of this act to the circuit court of appeals, an appeal may be taken from such interlocutory order or decree granting, continuing, refusing, dissolving, or refusing to dissolve an injunction to the circuit court of appeals:

"Provided, that the appeal must be taken within thirty days from the entry of such order or decree, and it shall take precedence in the appellate court; and the proceedings in other respects in the court below shall not be stayed unless otherwise ordered by that court during the pendency of such appeal:

"And provided further, that the court below may in its discretion require as a condition of the appeal, an additional injunction bond."

This last paragraph was added, and the first made to comprehend the refusal or dissolution of a pendente lite injunction, by the amendment of 1895.

Section 701 of the Revised Statutes of the United States is in words following:

"Sec. 701. The supreme court may affirm, modify, or reverse any judgment, decree, or order of a circuit court, or district court acting as a circuit court, or of a district court in prize causes, lawfully brought before it for review, or may direct such judgment, decree or order to be rendered, or such further proceedings to be had by the inferior court, as the justice of the case may require. The supreme court shall not issue execution in a cause removed before it from such courts, but shall send a special mandate to the inferior court to award execution thereupon."

Section 11 of the act of March 3, 1891, for the organization of the federal courts of appeal is in part in words following:

"All provisions of law now in force regulating the methods and system of review, through appeals or writs of error, shall regulate the methods and system of appeals and writs of error provided for in this act in respect of the circuit court of appeals, including all provisions for bonds or other securities to be required and taken on such appeals and writs of error, and any judge of the circuit courts of appeals, in respect of cases brought or to be brought to that court, shall have the same powers and duties as to the allowance of appeals or writs of error, and the condition of such allowance, as now by law belong to the justices or judges in respect of the existing courts of the United States respectively."

Section 10 of the act of March 3, 1891, above mentioned, is in part in words following:

"Whenever on appeal or writ of error, or otherwise, a case coming from a district or circuit court shall be reviewed and determined in the circuit court of appeals in a case in which the decision of the circuit court of appeals is final, such cause shall be remanded to the said district or circuit court for further proceedings to be there taken in pursuance of such determination."

F. T. Brown and Benj. Harrison, for appellant.

J. H. Raymond and Edwin H. Brown, for appellee.

Before WOODS and SHOWALTER, Circuit Judges, and BUNN, District Judge.

SHOWALTER, Circuit Judge (after the foregoing recital): Counsel, in their printed argument, have discussed the jurisdiction or province of this court on this appeal. What may be said touching the function of this court, the scope of the review which may be had

here, the form and effect of an adjudication here, either of reversal or affirmance, as bearing on the status of the cause in the circuit court, comes logically first in any pronouncement to be made on this record. In England, as I understand, the right of appeal in chancery cases was developed by the courts,—possibly out of analogies from the civil law. In this country the appeal is by statute, and ordinarily only from a final decree; but, whether from a decree which is final or interlocutory, statutory limitations control. Stevens v. Clark, 10 C. C. A. 379, 62 Fed. 321. Whether or not a decree be final, and on that ground appealable, depends in one sense on the nature of the adjudication as affecting the party against whom it is made. In Illinois there can be no appeal in a chancery case except from a final decree. In Blake v. Blake, 80 Ill. 523, the supreme court of that state said: "It is apprehended there can be no decree against a party that will work a deprivation of his property or liberty from which no appeal or writ of error will lie." See, also, the opinion of the supreme court of the United States by Mr. Justice Miller in Farmers' Loan & Trust Co., Petitioner, 129 U. S. 213, 9 Sup. Ct. 265. In Forgay v. Conrad, 6 How. 202, Judge Taney noticed that there might be two or more successive final decrees, and as many successive appeals, in the course of a single litigation. The power of a court of original jurisdiction over a final decree, or over that portion of a decree which is final, ceases (barring the matter of rehearing or bill of review) with the close of the term at which such decree was entered of record. Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207, 224, 10 Sup. Ct. 736, 741. Where no appeal is pending, a bill of review, which is a new suit, may doubtless be entertained after the term, showing error of law on the face of the record, or some new matter of fact occurring after the decree, or some matter of fact extant when the decree was rendered, but not then, and without fault on the part of the petitioner, brought to the notice of the court. In federal practice, under equity rule 88, a rehearing (presumably if the application be made during the term at which the decree was entered) can be had not later than the following term, and not after the term in which the decree was entered of record in any case where an appeal could have been taken. What may be done by bill of review after an appeal is not here considered. The point here is that a decree may be final, and on that ground appealable, in a case where, if no appeal be taken, a rehearing (Roemer v. Simon, 91 U. S. 149; Desty, Fed. Proc. 729) or bill of review would be available remedies in the court of original jurisdiction. It may not be out of place to add that a decree may be none the less final because it is incomplete in failing to provide for its own execution, and to so end the litigation. If no reservation be made in such decree, the power of the court over it ceases with the term at which it was recorded, and a new bill must be filed, if need be, in order to carry into execution the adjudications in such final decree. Hindes, Ch. 68; 1 Har. Prac. Ch. 148; Lube, Eq. 204. "When a decree does not adjourn the consideration of the cause, it is said to be a final decree." 2 Daniell, Ch. Prac. (6th Am. Ed.) 994. The footnote to this text contains the following:

"A decree which disposes of a cause without reserving anything for further consideration is, of course, final. Mills v. Hoag, 7 Paige, 18; Cook v. Bay, 4 How. (Miss.) 485; Britton v. Johnson, Dud. Eq. 24; Tennent's Heirs v. Pattons, 6 Leigh, 196; Talbot v. Todd, 7 J. J. Marsh. 456; Johnson v. Everett, 9 Paige, 636; Ex parte Crittenden, 5 Eng. (Ark.) 333. See, per Sutherland, J., in Kane v. Whittick, 8 Wend. 224; Harvey v. Branson, 1 Leigh, 108; Longfellow v. Longfellow, 1 Clarke. Ch. 344; Hey v. Schooley, 7 Ohio, 373; Brewer v. Connecticut, 9 Ohio, 189; Road Co. v. Elmer, 9 N. J. Eq. 754, 787; Webster v. Hitchcock, 11 Mich. 56. So, if it decides the rights of the parties on the merits, although it may make a reference to ascertain the amount due from one party to the other on the basis of the adjudication, reserving nothing except to determine that the report is strictly in conformity with the decree. Jones v. Wilson, 54 Ala. 50. Quackenbush v. Leonard, 10 Paige, 131. See Story v. Hawkins, 8 Dana, 12; Michoud v. Girod, 4 How. 503; Forgay v. Conrad, 6 How. 203. And such a decree is final, both as to an original and cross bill, that the equity of the case is with the complainant in the original bill, although leave is given to either party to apply, at the foot of the decree, for such further order as may be necessary to the due execution of the same, or as may be required in relation to any matter not finally determined by it. French v. Shoemaker, 12 Wall. 98. And see Wyatt v. Garlington, 56 Ala. 576."

"Strictly speaking, every decree settling rights upon a hearing on the merits of the original cause, or upon the equity reserved, is pro tanto a final decree. But where an appeal is only allowed by statute from a final decree, the courts have not agreed as to what decree shall be considered final within the meaning of the statute. The United States supreme court, under such a statute, has decided that, if the decree decides the right of property, and orders it to be delivered up or sold, or adjudges a sum of money to be paid, and the party is entitled to have such decree carried into immediate execution, it is a final decree, under the act of congress, from which an appeal lies, although there is a reference for an account between the parties upon the basis of the decree, and the cause is retained for the purpose of adjudicating these accounts. Forgay v. Conrad, 6 How. 203."

In Iron Co. v. Meeker, 109 U. S. 180, 182, 3 Sup. Ct. 111, it is expressly decided that a reservation as to the matter of costs does not make a decree in other respects any the less final and appealable.

In a patent case there can be no right to an accounting unless the infringement be made out; but the infringement may be found and the injunction awarded in favor of a complainant who, upon the proofs, has no right to an accounting. Upon the issue whether or not the complainant is entitled to the accounting, it may not appear that the defendant used or sold the patented device, but merely that he made it; or it may otherwise appear that there were, in fact, no profits, or that an account had already been stated, conditionally or otherwise, by the parties themselves, and that for want of notice, as provided in section 4900 of the Revised Statutes of the United States, no damages could be recovered. In such event there could be no award of an accounting in the decree, although the perpetual injunction would be awarded. Whittemore v. Cutter, 1 Gall. 478, Fed. Cas. No. 17,601; Elizabeth v. Pavement Co., 97 U. S. 127, 144. In a patent case on the equity side the primary and essential contention relates to the ownership of the patent by complainant, the validity of the claims, and the infringement. The final adjudication in favor of complainant on this contention is a perpetual injunction.

In the decree of March 12, 1895, the question of costs, as already stated, was expressly reserved, and the determination of the amount

for which on the accounting appellees were to have execution against appellants awaited the report on the reference. One portion of a given decree may be final, and for that reason reviewable on appeal, while the remainder may be interlocutory, and for that reason not appealable. Forgay v. Conrad, 6 How. 202; Iron Co. v. Meeker, 109 U. S. 180, 3 Sup. Ct. 111; McFarland v. Hall, 17 Tex. 691; Malone v. Marriott, 64 Ala. 486; Williamson v. Field, 2 Barb. Ch. 281; Dickenson v. Codwise, 11 Paige, 189. This appeal on the face of the record comprehends very clearly as the matter presented for review the ownership of the five claims, their validity, the infringement, and the perpetual injunction. If this portion of the decree of March 12, 1895, wherein the property right as between the litigants was adjudged, and the sentence of the court carried into immediate execution, be not in itself an "interlocutory order or decree," such as is identified in amended section 7 of the act of March 3, 1891, this appeal, if not authorized by section 6, should be dismissed; for, be it noticed, it is not any "interlocutory order or decree," but only one which comes specifically within the terms of amended section 7, that is appealable.

In this case, and as to that portion here appealed from of the decree, there was no reservation of any further hearing. It would have been within the power of the circuit court, though such a proceeding would have been exceptional, to retain the cause for further consideration as to the ownership, validity, and infringement of the patents. Such a reservation would have meant that the injunction was still within the control of the court, merely extant until further order, or subject to vacation on any change of view by the court, or upon additional evidence which the court might choose to hear. It would have been within the power of the court, also, upon such reservation, to require a bond from complainants conditioned to answer all damages in case the court should actually see fit, at a later day, to dissolve the injunction. But no such case is presented.

The "interlocutory order or decree" made appealable by amended section 7 must be one wherein the court grants, continues, refuses, dissolves, or refuses to dissolve an injunction. The state of the record or progress of the cause must be such, when said appealable "interlocutory order or decree" is entered, that a "final decree" upon the matter with which said "interlocutory order or decree" has to do may yet be made. The contrast suggested by the words "interlocutory order or decree" and "final decree," as used in the first paragraph of amended section 7, is between a decree which is preliminary to a hearing on the merits, and hence discretionary in the court, and one which follows a hearing on the merits, and is hence final, conclusive, and as of right in the prevailing party; between a decree which is meant to preserve the subject-matter of the litigation, or prevent irreparable injury, till a hearing on the merits can be had, and a decree which follows the hearing on the merits, and ultimately determines the rights of the litigants. The "interlocutory order or decree" made appealable by amended section 7 must be one which leaves the cause pending on the issues in the court of original jurisdiction. "The proceedings, in other respects, in the court be-

low, shall not be stayed unless otherwise ordered by that court during the pendency of such appeal." Upon entering an "interlocutory order or decree" for an injunction, the court may, and ordinarily does, require the complainant to give a bond which will protect the defendant against loss in case such injunction be dissolved. If another "interlocutory order or decree" be afterwards made on defendant's motion dissolving said injunction, and the complainant appeal, "the court below may, in its discretion, require as a condition of the appeal an additional injunction bond." In other words, no "order or decree" for an injunction can be appealable under amended section 7, unless it would have been competent for the court to require an injunction bond when such order or decree was entered.

Can that portion of the decree which constitutes the adjudication specifically appealed from in the case at bar be crowded into the limitations fixed in amended section 7 for the "interlocutory order or decree" there made appealable? The injunction here is perpetual. How can a perpetual injunction, where no power over the same is reserved, be the subject of an interlocutory order? See 2 Daniell, Ch. Prac. 1683. On the face of the decree now here, no further action was to be taken by the court in the matter of the injunction or of the ownership, validity, or infringement of the patents. On the face of the decree, the injunction without limitation went as of right in the complainants, and not as of discretion in the court. On the face of the record, this decree, so far as concerns the adjudication appealed from, was not preliminary. It was technically and essentially on the merits, and after the parties had had in the fullest sense their day in court. This was a decree in which, as a condition of the injunction, no bond was, or could without error have been, exacted from complainants, they being, on the face of this decree, entitled to the perpetual injunction as of right. The hearing which resulted in this decree was of such kind that, if the court had found no infringement, and an injunction previously issued against defendants had been dissolved, no "additional injunction bond" could have been required as the condition of an appeal by complainants. The hearing which resulted in this decree was of such kind that, if the court had found no infringement, the decree must have been a dismissal for want of equity as to all the patents sued on; and such decree, whether it dissolved a prior injunction or not, could not have been interlocutory, within the sense of section 7. Furthermore, this appeal would not seem entitled to precedence in this court. The statutory requirement of precedence in appeals under amended section 7 is senseless when applied to this appeal. The precedence is given because the decree to be appealed from under that section awards or dissolves an injunction against the alleged right of the appellant before he has had his day in court upon the merits of that right, or, if the appeal be from a refusal to grant an injunction, because the appellant may be irreparably injured before his case can be heard on the merits.

On the reversal of an order or decree granting a pendente lite injunction—an order which would be strictly interlocutory within the sense of amended section 7—this court must, if in the opinion

of the judges here the record call for such action, issue its mandate directing the trial court to dismiss the bill for want of equity. The general rule that a court of review may, whether the adjudication appealed from be interlocutory or final, direct the court of original jurisdiction to enter whatever decree ought to have been entered in the first instance, as in Le Guen v. Gouverneur, 1 Johns. Cas. 436; Richmond v. Atwood, 2 C. C. A. 596, 52 Fed. 10; Bissell Carpet-Sweeper Co. v. Goshen Sweeper Co., 19 C. C. A. 25, 72 Fed. 545; and Green v. Mills, 16 C. C. A. 516, 69 Fed. 852, the opinion in the last-named case being by Chief Justice Fuller,—need not be dwelt on. Section 701 of the Revised Statutes of the United States, quoted in connection with appropriate provisions from the act of March 3, 1891, in the statement which precedes this opinion, seems to be law for the federal courts in such a case. The order, when entered by the circuit court pursuant to the mandate, would be the final decree in the cause. This court would not, by such mandate, exercise original jurisdiction. The mandate would be the logical and necessary outcome of the review by this court of what had been done in the court of original jurisdiction. The words, "the proceedings in other respects in the court below shall not be stayed unless otherwise ordered by that court during the pendency of such appeal," in section 7, seem to imply that the mere perfecting the appeal shall not, in legal effect, stay the suit. In view of the decisions of the federal courts of appeal above cited, those words are not deemed a limitation on the appellate power of these courts. A judgment of reversal in the case at bar would, therefore, be the same in form and effect whether the matter here appealed be a "final decision," within the meaning of section 6, or an "interlocutory order or decree," within the meaning of amended section 7.

If, however, we find no error in the record, the stress of the situation will become manifest. This is a court of review. It may, on the one hand, reverse, in whole or in part, the decree appealed from; or, on the other, approve and affirm. In the latter event— barring the rule that no subsequent appeal on the same question can be entertained, since this court has no power to review its own adjudications—the decree would stand in the lower court precisely as though no appeal had been taken. This court has not original jurisdiction. It may not usurp or repress the judicial power of the circuit court. Whatever of force or virtue there may be in a decree of the circuit court is attributable to the judicial power vested by law in that court. There is no power in the court of appeals whereby its affirmance, or approval on review, of a decree of the circuit court, can give a finality to that decree which it did not have when entered of record in the circuit court. If the matter here appealed be an "interlocutory order or decree," a judgment of affirmance (that is to say, a refusal to reverse) by this court cannot make it a final decree. If, so far as concerns the ownership of the claims, their validity, the infringement and the injunction, the decree entered in the circuit court on the 12th day of March, 1895, be an interlocutory order or decree, then, as pointed out by Judge Jackson in Watch Co. v. Robbins, 3 C. C. A. 103, 52 Fed. 337, all questions concerning

such ownership, validity, infringement, and injunction (the hypothesis for the present being that no error is well assigned) are still within the judicial power of that court. If to the order on the master's report and the costs yet to be made in the circuit court there shall be added a recital whereby that portion of the decree of March 12th brought here by this appeal is re-entered or "confirmed" by the circuit court, that order, on the hypothesis now in question, will be the "final decision" or "final decree," and by the statute an appeal can again be taken to this court, and this court will be bound by the statute to rehear, reconsider, and render a judgment upon the very questions which must be decided on the present appeal, and that without any change whatever in the record, so far as concerns said questions. In view of this impossible and absurd result,—enlarged upon by the court of appeals of the Sixth circuit in the case next below cited,—either the adjudication brought up by this appeal was not "an interlocutory order or decree," within the meaning of amended section 7, when entered of record in the circuit court, or it will cease to be interlocutory, and become final, as the legal result of affirmance (or a refusal to reverse) by this court.

In Bissell Carpet-Sweeper Co. v. Goshen Sweeper Co., 19 C. C. A. 25, 72 Fed. 545, after a full hearing on the merits in the circuit court, a decree was made and recorded wherein was adjudged the validity of the patent, complainant's ownership, the infringement by defendant, and a perpetual injunction. It was also found in this decree that complainant was entitled to an accounting, and a reference to a master was made on that matter. The defendant appealed, and the court of appeals affirmed. After the judgment of affirmance, and long after the close of the term in the circuit court at which the decree was recorded, but prior to the report on the accounting, the judge in the circuit court, conceiving the decree to be in all respects still within his control, on motion of complainant vacated the injunction so far as to permit the defendant to complete and sell certain of the infringing devices, the sales so made to be accounted for before the master. From this order complainant appealed, and the court of appeals reversed, declaring that the circuit court had no power to change or modify the injunction; that the decree was final and conclusive so far as concerned the patent property, the validity of the patent, the infringement, and the perpetual injunction. But the learned writer of the opinion, Lurton, Circuit Judge, in the line of reasoning whereby he reached this conclusion, said that the finality of the decree in the respects mentioned was due to the affirmance in the court of appeals; that the decree in the respects mentioned was an interlocutory decree till so affirmed, and then, and as the legal result of such affirmance, became final. The rule whereby, on the reversal of an interlocutory decree, a mandate may direct a final decree to be entered in the circuit court was dwelt on in the opinion, but the learned judge failed to note the contradiction involved in the proposition that an affirmance can alter the essential character of the decree affirmed. The decree which the circuit court attempted to change was, so far as concerned the pronouncements therein which were executed by the perpetual

injunction, either a "final decision" when entered of record, or it remained, after as before affirmance, interlocutory. The want of power in the circuit court over that portion of the decree, if that court were foreclosed at all, dated, not from the order of affirmance, but from the end of the term at which such decree was recorded.

In Watch Co. v. Robbins, 3 C. C. A. 103, 52 Fed. 337, also in the court of appeals of the Sixth circuit, which was an appeal by the defeated defendant in a patent case from a decree of the kind already described, counsel for both sides joined in a motion whereby the court of appeals was asked to "hear and finally determine the merits of the controversy relating to the validity of the patent in suit and the infringement of the same," as though a decree which had been made pursuant to a final hearing on the merits could be reviewed otherwise than on the merits, and as though the consent of counsel (Stevens v. Clark, 10 C. C. A. 379, 62 Fed. 321) could give to the court of appeals a jurisdiction which, by their application, they seemed to concede was not given by law. The court of appeals assumed without question that the decree was in all parts interlocutory. From this assumption it seemed to follow, as in effect pointed out in the opinion by Judge Jackson, that the ownership, validity, and infringement of the patent were still open questions in the circuit court; in other words, that the court of appeals was powerless to make any adjudication (of affirmance) which, on the theory of the motion, would have force in the circuit court. The matter was thereupon certified to the supreme court of the United States. The latter tribunal dismissed the certificate for want of form. The court of appeals thereupon heard the appeal, and delivered a second opinion. 12 C. C. A. 174, 64 Fed. 384. The record was fully considered, and the decree affirmed. The opinion contains the statement that on the then present appeal the court of appeals could "hear and finally determine the merits of the controversy as to the validity of the patent and its infringement." The court of appeals had no original jurisdiction. The decree affirmed, it would seem, was no more conclusive as the result of the affirmance than it would have been if no appeal had ever been taken. The import of the opinion is that no appeal could be again entertained upon "the validity of the patent and its infringement." This means that the circuit court had exhausted its power in making the decree appealed from so far as concerned "the validity of the patent and its infringement"; in other words, that to this extent the decree already of record in the circuit court and under review in the court of appeals was final.

In Bissell Carpet-Sweeper Co. v. Goshen Sweeper Co., supra, it is said:

"The doctrine of res adjudicata rests upon the maxim that there should be an end to litigation. No doctrine rests upon sounder principles of public policy, or is more entitled to a wide application. If, under an appeal from a decree awarding an injunction, this court obtains such a record as to enable it, with justice to the parties to the appeal, to hear and consider the merits of the cause, it would be most anomalous if we have not the power to decide. The judicial function of considering involves the function of determining. The decision of an appellate court is final, and no second appeal is maintainable, except as to matters reserved, or proceedings subsequent to the

first appeal. These considerations lead us to the conclusion that, inasmuch as it was decided upon the former appeal that the patent of the complainant was valid, and that the defendant had infringed it, and a perpetual injunction had been properly awarded, there was no power in the circuit court to dissolve, modify, or suspend the injunction. There was no room for the exercise of judicial discretion. The complainant was entitled to the remedy by injunction which had been accorded him, and that relief had been affirmed by this court."

If the ultimate judgment of the court of appeals in the last-named case that the circuit court could not change the decree as was attempted be sound, then, since the court of appeals had no original jurisdiction in such a case, since in affirming that court merely approved or declined to reverse or modify the decree appealed from, that decree, so far as the quality of conclusiveness or finality attached at all, must have been final and conclusive when entered of record in the circuit court. The determining consideration in the opinion seemed to be that by the affirmance the decree appealed from became the decree of the court of appeals. But, in the nature of things, as well as by the terms of section 701, the court of appeals can merely direct a decree "to be rendered" in the circuit court, and that only when the decree appealed from is reversed or modified. The power incidental to appellate jurisdiction is the power to direct the circuit court to enter such a decree as on the showing of the record ought to have been entered by that court. What is done by a court of original jurisdiction pursuant to a mandate from a court of review on reversal is precisely what ought to have been done by the court of original jurisdiction in the first instance. The legal force as res judicata of a final decree entered in a circuit court pursuant to a mandate from a court of appeals is the same as though such decree had been entered originally, and in place of the erroneous decree which was annulled on appeal. If, for instance, and to take an extreme and exceptional case, after the hearing, as shown by this record, the circuit court had incorporated in its decree a reservation whereby the defendants were at liberty to present further evidence or further argument on the ownership, validity, or infringement of the patents, or given liberty to move at or before the coming in of the master's report to vacate the decree for the injunction, it would then have been within the authority of this court upon approval here of the holdings below touching the ownership, validity, and infringement of the two patents in question on this appeal, to reverse such decree so far as concerned the reservation specified, and direct that a final and perpetual injunction without reservation or condition be ordered in the circuit court; in other words, to reverse or modify the decree of the circuit court, and direct to be entered in that court the decree that ought to have been originally entered there. It may be here added that in each of the following cases: Bouchier v. Taylor, 7 Brown, Parl. Cas. (1st Ed.) 414; Governors of St. Stephen's Hospital v. Swan, 5 Brown, Parl. Cas. (1st Ed.) 454; Ellis v. Seagrave, Id. 478; White v. Lightburns, 2 Brown, Parl. Cas. (1st Ed.) 405; Scribblehill v. Brett, 1 Brown, Parl. Cas. (1st Ed.) 57; Rous v. Barker, 3 Brown, Parl. Cas. (1st Ed.) 80; McCan v. O'Ferrall, 8 Clark & F. 30; Le Guen v. Gouverneur, 1 Johns.

Cas. 437; Bush v. Livingston, 2 Caines, Cas. 66; and Bebee v. Bank, 1 Johns. 529,—the decree of the court of original jurisdiction was reversed, and another decree, such as ought to have been rendered by that court on the showing of the record, was directed to be rendered in that court by the mandate of the court of error.   These and one other—Dale v. Roosevelt, 6 Johns. Ch. 257, which does not appear to concern the question—are the citations in Bissell Carpet-Sweeper Co. v. Goshen Sweeper Co., supra, from which, more distinctly than from any other, was evolved the proposition that an affirmance by a court of error can add finality to a decree which, when entered of record in the court of original jurisdiction and up to the time of such affirmance, was not final.

It is true, indeed, as stated by Judge Lurton, that "the judicial function of considering involves the function of determining." But what a court of error considers is the soundness of the decree appealed from, and the legal sufficiency of that decree to meet the showing of the record on which it rests.   What it determines is either that such decree is not the appropriate conclusion from the record, but that some other decree would have been, in which event the decree which ought to have been originally entered is directed by the mandate; or, on the other hand, that the decree appealed from was the just conclusion of law and fact, in which event that decree as originally made by the circuit court is affirmed.   The effect, the decree in question being one on the merits, is that the power of the court of error is exhausted,—the possibility of further consideration of the same matter by the court of error, the possibility of reversal or modification on appeal, is extinguished.   The status of the case becomes the same, so far as the law of res adjudicata is involved, as though no appeal had been taken, but the time limit for an appeal had expired.   The argument and conclusion of Judge Lurton, if addressed to the proposition that the decree, when entered in the circuit court, was final on the ownership, validity, and infringement of the patent and the injunction, would seem unimpeachable.   In other words, from his proposition, as applied to the court of appeals, that "the judicial function of considering involves the function of determining," and from the further proposition that the court of appeals on the prior appeal was bound by law to hear and determine,—in other words, had jurisdiction,—it followed, as the matter appears to the writer of this opinion, not that finality was given by the affirmance to a decree which had not that quality when entered, but that such decree was really final when entered in the circuit court, and so continued from that date.

In Richmond v. Atwood, 2 C. C. A. 596, 52 Fed. 10, the decree in favor of the complainant patentee was reversed, and the cause remanded, with the direction that the order of reference be vacated, and the bill dismissed for want of equity.   Whether the appeal in that case were by section 6 or by section 7, it was, as already suggested, entirely competent for the court of appeals upon reversal to direct a decree which, when entered of record by the circuit court, would be final.   See, also, Green v. Mills, 16 C. C. A. 516, 69 Fed. 852.

By section 6 of the act of March 3, 1891, this court is required to review any "final decision" of the circuit court in a patent suit. That portion of a decree in such a case which formulates on the record of the court what is in truth a "final decision" is expressly made appealable. In Potter v. Mack, Fed. Cas. No. 11,331, Judge Swayne declared that the portion—such as is here appealed from—of a decree in a patent case is a final decision. If in a decree in a land case it be declared that certain premises held by defendant, and which defendant claimed as his own, is the property of complainant, and that the possession thereof be turned over from defendant to complainant, or that a writ of possession forthwith issue, and if in the same decree it be found that complainant is entitled to an accounting as to the rents and profits, and a reference be made to a master on such accounting, such decree, apart from the accounting, is final and appealable. White v. Ross, 147 Ill. 427, 35 N. E. 541; Forgay v. Conrad, 6 How. 202. In the case at bar the bill was dismissed for want of equity as to certain of the patents in suit. So far as concerned other patents, and by that portion of the decree which constitutes the matter of this appeal, the property in contention was, after a final hearing, not only adjudged in favor of complainants, but, in effect, taken from defendants, and actually and finally put into the exclusive possession of complainants. The adjudication appealed from was not only made, but executed. The business of defendants, so far as it depended on their ownership and use of the devices in suit, was stopped at once and forever. Their liberty in that regard was taken away. Their property rights, or what they supposed to be their property rights, were annulled or transferred to complainants as distinctly as though land or money, being the subject of contention, had been taken from their possession and delivered to complainants.

Section 6 should be considered in connection with amended section 7. The latter section has been made the subject of comment in this opinion. The words "final decision" in section 6 may include a perpetual injunction decreed against a defendant after a full hearing on the merits in a patent case. Said words certainly must be held so inclusive if the legislative policy to that effect appear affirmatively and by reasonable intendment. By providing an appeal from a preliminary or pendente lite injunction, and in an adjoining section of the same act giving an appeal from any "final decision," the lawmakers indicated that a perpetual injunction decreed as the outcome of a final hearing on the merits in a patent case was appealable as a "final decision." The proposition that a defeated defendant in a patent case must submit to the perpetual injunction decreed against him without any right of appeal during the interval of months or years which may elapse between the entry of such decree and the order on a master's report touching the amount of money for which complainant shall have execution, is not to be entertained in view of the legislation now current. The assumption that section 6 of the act of March 3, 1891, must be deemed the equivalent of section 692 of the Revised Statutes of the United States as construed by the supreme court in Barnard v. Gibson, 7 How. 650,

and Humiston v. Stainthorp, 2 Wall. 106, has been the source of perplexity in the federal courts of appeals. But the two statutes are not the same. Section 6, so far as concerns a perpetual injunction in a case like the one here, must be read in connection with amended section 7. It was competent for the lawmakers to declare that a defendant in a patent suit can have an instant appeal from an adjudication on the merits, whereby he is perpetually enjoined. It was competent for them to declare that the portion—such as here appealed from—of a decree in a patent suit is and shall be deemed final. Section 6 and amended section 7, when read together, seem to carry this meaning. To construe these statutes otherwise, assuming jurisdiction in this court over an appeal like the one here, would lead, as suggested, to exceptional and impossible results.

This controversy is waged most strenuously as to letters patent No. 456,122. The invention of that patent is an improvement in "means for controlling the operation of elevators" used for carrying passengers to and from the upper floors of city buildings. A three-armed lever, fixed at the bottom of the elevator shaft,—that is to say, a straight beam placed normally horizontal and pivoted in the center, with an arm extending from the pivotal point downwards,—was, at the time of this invention, a known means of controlling, through pulleys and cables, with suitable attachments, the movements up or down of the car of a hydraulic elevator by the attendant in charge of such car. The downward arm is attached at its point to a rod connecting with a valve which, when such arm is perpendicular, and the beam horizontal, closes the opening or openings whereby water passes to and from the cylinder. When one side of the beam is depressed, the water passage or inlet is uncovered, so that the water is pumped into the cylinder. The piston is at the same time driven or pushed forward in the cylinder pulling down the lifting cables, and the car rises. When the other side of the beam is depressed, the valve shuts off the water from entering the cylinder, and uncovers the opening for the exit, and the car descends by its own weight, driving the piston backward, and expelling the water through said place of exit. The problem before the patentee, Reynolds, was to devise a means of operating from the moving car the three-armed lever, which would be different and superior to any means already known. As shown by the patent in question, he fixed under the car, and pivoted to a downward projection from the floor of the car, a second three-armed lever or horizontal cross beam, with an arm projecting upward through a slot in the floor of the car. From one end of this second beam a rope extended downward, around a pulley on the corresponding end of the beam first described, thence upward along the side of the car and the elevator shaft to the top of the shaft, thence over a second pulley and down to the roof of the car adjoining that side of the shaft where it was secured to the car. From the other end of said secondly described arm passed another rope downward and around a like pulley at the other end of the beam first mentioned, thence upward along the opposite side of the car to a second pulley at the top of the shaft, and thence down said opposite side of the shaft to the roof of the car,

where it also was secured. The two ropes or cords were of equal length, and they and the pulleys were arranged symmetrically. In this construction assuming the car to be stationary at any position in the shaft, the handle or arm of the lever projecting through the car floor will be vertical, and the tension of the two ropes or cables will be the same. If the attendant move this handle to the left, the end of the rope to the right will be pulled upward, bringing with it the right end of the lower beam. The left end of the lower beam will at the same time be correspondingly depressed. By this action the car will be set in motion, and so continue till the attendant move the handle again to the vertical position, when the car will stop. By a movement of the handle to the right, the car will go in the opposite direction. The tension of the two cords remains at all times substantially the same, and the force which must be exerted by the attendant to shift the handle is subject to only slight variation. Moreover, the movement of the car is steady and uniform, and always within easy control of the attendant. The patent, the invention thereof being described in appropriate specifications, and illustrated by drawings, had two claims. They were in words following:

"(1) In a controlling device for elevators, the combination of a car, two cables attached positively at each of their ends to travel with the car and connected with the controlling device, and an operating device upon the car to positively take up and pay out said cables to shift positively the controlling device, substantially as set forth. (2) In controlling devices for elevators, the combination of a car, traveling cables connected positively at each of their ends to the car, and passing over stationary pulleys at one end of the well and around movable pulleys connected to the controlling device at the other end of the well, and means for positively contracting and relaxing the bights of the cables, substantially as set forth."

It is strongly urged that this device is anticipated by a German patent to one Lampe, published June 3, 1882. This publication discloses a control device for an elevator. The drawing which is part of said publication exhibits the device as applied to a platform or freight elevator. A single cord, attached to a fixture marked "g" on said platform, passes downward to and around a pulley firmly secured at the bottom of the elevator shaft, thence up through or alongside the car or platform to and over a pulley at the top of the elevator shaft, thence back to the fixture aforementioned on the said platform, where it also is secured. The upper pulley is in a slotted or forked lever or arm hinged or fulcrumed at one end so that such pulley may be moved downward by a pull from the person on the platform who seizes for that purpose a handle or stirrup marked "h," attached to the cord three or four feet above the point "g," where the two ends are fastened, as already mentioned. The downward movement of the lever shifts the valve, whereby motion is imparted to the car or platform. A counteracting weight is depended on to lift, by means of another cord running over pulleys, the end of said lever when the pull on the rope by the attendant or person using the elevator ceases. Said counterweight is also depended on to reset the valve in its normal position, and it must be sufficiently heavy for that purpose. In using this device, as the downward pull of the handle is made, the cord becomes slack between "h" and "g." When

the car or platform is stopped at the bottom of the shaft, the counterweight pulls up the lever marked "d," thus raising the cable, which in that position hangs the full length of the shaft on one side and nearly the full length on the other, and also resets the valve. When the car or platform is stopped at the top of the shaft, the counterweight is opposed—apart from the force necessary to reset the valve —by the weight of that side of the cable which extends to the pulley at the bottom of the shaft. The difference in weight between the cable as suspended over the upper pulley and the counterweight therefore varies with the position of the car, being least at the bottom and greatest at the top. The force which the attendant must use in pulling down the handle, "h," must overcome this excess of weight together with that resistance which, when the pull ceases, resets the valve. This force, therefore, varies in like manner as described. The pull when the elevator is at the top is stronger by the weight of nearly one entire side or half of the cable than when at the bottom, and the variation is continuous between these extremes. Upon the showing of the evidence here, this variation in the force required from the attendant might be so great in a tall building as to render the operation of the Lampe control device impractical. It is said in this publication respecting the Lampe device that "for moving   *   *   *   valves   *   *   *   that have not the tendency to return to the closed position the mechanism is doubled, whereby the loose pulleys are placed on a two-armed lever that can then act directly as a cock-key or beam." No suggestion is made in said publication touching any method or means of doubling or duplicating the "mechanism." The matter quoted is all that is shown on that subject. If we suppose the two-armed lever to be a beam, such as is shown in the Reynolds device, pivoted in the center, and having a pulley at each end, then, assuming each of the cords to have both ends fastened to the car, as shown with respect to the one cord in the diagram accompanying said publication, the device would be manifestly inoperative. The handle, "h," could not be pulled down, since the cord over the adjacent and opposite pulley would resist the pull. In other words, both cords must, under such conditions, necessarily remain taut. If one of the cords or ropes in the Reynolds device be discarded, and in place of the pulley at the end of the lower rocking beam around which said discarded rope would pass a spring or weight be made use of to act automatically in bringing said beam back into the position where the handle, L, will be vertical,—in other words, to react against the force used by the attendant in handling the car,—then the Reynolds device would be analogous to that of Lampe. It would then also be subject to the objections already noticed with respect to the Lampe patent. The attendant must use force enough to overcome the resistance of the weight or spring and also the varying resistance of that portion of the cord or rope which, having its attachment underneath the car, lengthens as the car rises. In the Reynolds patent there is no weight or spring to be overcome by the attendant, and the two cords pendent from the ends attached to the lever under the car, and which lengthen equally as the car rises, counterbalance each other in weight, so that the movement

of the handle, L, by the attendant is not affected by any difference in weight between the two. The arrangement of the two cables "substantially as described" in the specification and illustrated in the diagram of the Reynolds patent, whereby they counterbalance each other, and secure substantial steadiness and uniformity of force in the movement by the attendant of the control device, is the characteristic feature—the point upon which the invention centers—in that patent. There is nothing in the Lampe publication which could have suggested the Reynolds device. Nor, for reasons already given, does the arrangement of the single rope as shown in the specification of patent No. 456,107 to Baldwin anticipate the Reynolds patent in suit. The last-named invention is not a doubling or duplication of cables or of "mechanism," as shown by Lampe or by Baldwin. The "two cables attached positively at each of their ends, * * * substantially as set forth" in the specification and diagrams, is an essential element of the invention in suit. With the Lampe publication or the Baldwin patent before him, it would have still called for invention in Reynolds to arrange two cables as shown in patent No. 456,-122.

There was, it seems, an interference proceeding in the patent office between Baldwin and Reynolds. The issue there concerned a claim framed in words following:

"(1) In controlling devices for elevators, the combination of a car, flexible means attached to the car to travel therewith and connected to the operating mechanism, and a device on the car to take up or pay out said flexible means to shift the operating mechanism."

The "flexible means" in Baldwin's patent was, as already stated, a single rope. The feigned claim, as applicable to his patent, implies any kind of device which, upon analysis, turns out to be a mere multiplying of that invented by him. So far as the mere idea of two cables being essentially a duplicate of his one cable is concerned, Baldwin is doubtless prior to Reynolds. But the method of combining the two cables, which, as has been suggested, is the essential point in the Reynolds patent, is not comprehended in said feigned claim. Nor is it material that Reynolds, as against Baldwin, would not be entitled to a claim as framed in the interference proceeding. In the course of this interference Reynolds made a concession to Baldwin in words following:

"I hereby concede priority of invention to C. W. Baldwin in the matter of the above interference, so far as the invention contained therein is set forth in the single-rope device in the application of said C. W. Baldwin, No. 179,-534."

This concession, which concerns the patent already spoken of and afterwards issued as No. 456,107, in view of what has been said, amounts to nothing as against the validity of the Reynolds patent.

The application for the Reynolds patent was filed January 26, 1887. The patent was finally granted July 14, 1891. On December 15, 1885, one Rudolph C. Smith filed an application and on January 26, 1886, there was issued to him a patent showing a device which, as counsel for appellees apparently concede, would have been an anticipation of the Reynolds patent. But appellees meet the

point with the insistence that Reynolds was in fact the prior inventor. An original sketch or free hand pen and ink drawing on paper was put in evidence by appellees. It is not seriously contended, and this court cannot hold on the evidence here, that this drawing was not made by Reynolds, that it was not made in September, 1884, and that it was not an original conception, so far as Reynolds was then advised. Appellants say that such drawing shows the invention of another patent, applied for by Reynolds in January, 1885, wherein the two cables pass from the car down to the pulleys as hereinbefore described. thence up the sides of the shaft and over the upper pulleys and down to weights pendent at their ends. This latter device plainly appears in the sketch, and as the principal subject-matter thereof; but lines are also indicated from each of the upper pulleys to opposite points of attachment in the roof of the car. These lines show unmistakably the conception of the patent in suit, though it is obvious that at the time of making the sketch Reynolds regarded the plan of the pendent weights as preferable to that of fastening the upper ends of the cables to the car. But in February, 1885, he reduced the invention of the patent in suit to practice by detaching the weights from the ends of the cables—in the case of an elevator in a building in Chicago equipped with his pendent-weight device—and fastening the ends to the top of the car. Appellants contend that the sketch of September, 1884, does not show the conception of the device in suit. We think, as did the trial judge, that it does, beyond reasonable question. This original sketch and the proof concerning it being in the case, it became necessary for appellants to prove that the invention by Smith was prior to September, 1884. They attempted to prove by the recollection of witnesses that Smith had sketched the device in question in 1881. Rebutting testimony was introduced by appellees. From all the testimony on the subject, it is plausibly contended that what Smith then sketched was a different device forming the subject-matter of an application for a different patent. If the sketch then made by Smith did show the conception of the Reynolds invention, such sketch was not preserved, nor was there any reduction to practice by Smith. If the idea of the invention were present in Smith's mind in 1881, he apparently regarded it as of no practical value. It was not for him to place an embargo on invention by conceiving and merely retaining the idea without taking steps to put it in practice, or secure a patent.

In December, 1884, Reynolds and Smith, who were intimate acquaintances, met, and conversed with each other. In the course of their conversation they talked of the invention sketched by Reynolds in September. Reynolds, as he testifies, then made a pencil drawing, showing his plan of the pendent weights. He swears also that Smith then made a pencil drawing, showing the cables attached to the car. These pencilings by the two were not put in evidence or preserved. It may be that Smith conceived the invention prior to this talk. It is possible, however, that he conceived it during the talk, and from what was then disclosed to him by Reynolds himself. But Reynolds evidently received at that conversation, and, for a time

at least, retained, the impression that Smith had anticipated him in the plan of attaching the upper ends of the cables to the car. Admissions, subsequent to this conversation, express or implied, by Reynolds, are urged in aid of the showing that Smith was the prior inventor. But these admissions were evidently based on the conversation of December, 1884, and the impression already referred to then made on Reynolds. They cannot raise any estoppel as against these appellees and in favor of these appellants; nor do they have any efficiency as proof against the sketch of September, 1884. That memorial of the Reynolds invention, with the testimony concerning it, is substantially unassailed. The showing of the record would not justify a pronouncement from this court that the trial judge ought to have declared the priority of Smith's invention as a ground for invalidating the Reynolds patent.

Assuming the validity of this patent, it is not contended that appellants do not infringe. The three claims of the patent No. 328,-614, together with the two claims of patent No. 456,122, all concern portions of the equipment of a hydraulic elevator. The assignments of error are three in number, and are set forth in the statement which precedes this opinion. The first assignment is not distributive or severable as between the five claims. The proposition to which appellants commit themselves is that their construction is not an infringement of any one of the five claims. This court cannot sustain the assignment in form and effect as made without declaring that no one of the claims is infringed. So, also, as to the second assignment. The proposition therein put forward by appellants is that neither of the patents is valid. This court cannot sustain this assignment without holding that both are invalid. But two of the claims were infringed, and one of the patents, namely, that numbered 456,122, is valid. Assuming that the two assignments of error meet the technical rules of this court,—a matter not here decided, since a court of error may, of its own motion, reverse for an error not assigned,—this court must necessarily overrule said assignments. The situation here is plain enough without elaboration. It has been law time out of mind that a demurrer to an entire declaration must be overruled if there be one good count. Such demurrer asserts that no cause of action is shown. It therefore raises no further question if one count be good. The argument in such case may properly cover all the counts, but the ruling is complete with the determination that one count is good.

Since this court may reverse for an error not assigned, and in view of misunderstandings as to the scope and effect of this appeal, the validity and alleged infringement of the three claims of patent No. 328,614 have been considered. Claims 2 and 4 are in words following:

"(2) The combination, with a hydraulic cylinder and piston and a change or reversing valve for controlling the flow of water to and from the cylinder, of an air-escape pipe leading from the top of the cylinder to the valve-casing, and controlled by said change or reversing valve, substantially as and for the purpose here described."

"(4) The combination, with the horizontal cylinder, A, its piston, piston-rod, and cross-head, of two sets of sheaves, B, B', the change or reversing valve

whereby the flow of water to and from the cylinder is controlled, and the water-passage, H3, leading from said valve to the bottom of the cylinder at the rear end thereof, whereby the discharge of any foreign matter from the cylinder will be facilitated, substantially as and for the purpose herein described."

Reading these claims in connection with the drawings and specification, the matter to be noted as bearing upon the infringement in dispute is the provision whereby, at each backward full stroke of the piston, the accumulated air is expelled from the cylinder through one opening or passageway and the water by another, these two passageways uniting, after they have ceased to be integral with the interior space of the cylinder, and thence constituting a common passageway to a common exit on an elevation with the uppermost surface of the cylinder. "The flow of water" spoken of in claim 2, and means therefor, namely, the large pipe from the bottom of the cylinder, or some other separate means for "the flow of water," must be thought of in order that the air-escape pipe can be an air exit as contrasted with the water exit. By fair implication from the terms of the claim, the change or reversing valve controls a flow of water which leaves the cylinder at one point, and also a flow of air which leaves the cylinder at another point. Claim 4 contains factors other than and in addition to factors shown in claim 2. The emphatic feature is the large pipe or water passage, H3. This exit from the cylinder is a water exit connected at the lowest plane of the cylinder, so that the water flow may carry with it hard substances which might otherwise remain in the cylinder, and interrupt the free movement of the piston. But it is described as a water-passage, not an air exit, or an exit for water and air; and in the invention of this patent described in the specification a passage intended for air and a passage for water, the two passages being separate and distinct from each other where they leave the cylinder, is a feature. The "cylinder, A," and "the change or reversing valve," constructed "substantially as and for the purpose herein described," are a cylinder with a hole in or near the upper surface, through which the accumulated air escapes at each backward stroke of the piston, and a valve with a hole in the upper casing, or some other means of ingress, whereby the air from the cylinder enters. A closed passage from one hole to the other, or from the hole in the cylinder to the interior of the valve-casing, is shown as part of the invention, and is necessary to make the combination operative as intended. The air-escape pipe, or some means other than the water passage H3, for the escape of air, must be assumed in view of the specification and drawings, in order that the passage, H3, may be in fact what it is called, and evidently intended to be, a water passage, and not the common and sole passage for water and air. In the construction of appellants the water is expelled from the cylinder through an opening along the lowest portion of its rear end into a compartment the lower internal level of which is not above the lowest portion of the cylinder. It is thence carried upward to the highest elevation of the cylinder, where it is joined by the air driven into the same compartment by the same movement of the piston through a hole or passageway in the end and near or adjoining the extreme upper surface of the cylinder,

such water and air thus driven through these two exits being from their place of junction as indicated carried together and expelled through the main change valve. The air is forced out of the cylinder at one place of exit, the water mainly at another, at each backward stroke of the piston; and the air exit opens into the water passage, so that the two elements finally pass out at a common place of exit through the main change valve, and on an elevation with the upper surface of the cylinder. It may be added that the water exit from the cylinder is apparently so constructed that the outward flow or wash through said exit may carry with it deposits of foreign matter on or near the bottom of the cylinder. We do not understand from the record that either of the combinations set forth in these claims, as read in connection with the drawings and specification, was contained in the prior art. These two claims were held valid, and the infringement declared, as well by Judge Blodgett, who was so sure upon both points that he granted a preliminary injunction, as by the learned circuit judge from whose decree this appeal was taken. Apart from niceties of construction, and in view of the invention as shown and described in the patent, it does not seem appropriate, on the state of this record, to reverse the ruling of the circuit court on either of these claims.

Following are the words of claim 6:

"The combination, with the cylinder and piston of a hydraulic elevator and a passage for liquid to and from the cylinder of a shut-off or safety valve arranged in said liquid passage, an unbalanced piston for holding said valve normally open, and appliances through which said valve is moved automatically against the pressure of water on said piston to close the valve as the main piston approaches the end of its movement, substantially as herein described."

As shown by the drawings and specification of this patent, the secondary or limit stop valve called in the claim the "shut-off or safety valve" is placed in the water passage between the main or change valve and the cylinder. Through this passage the water is driven to the cylinder from the main valve, and from the cylinder to the main valve. In or across this passage is the safety valve. Its purpose is to stop, when the car is at the top or bottom of the shaft, the flow of water, whether it be coming in towards the cylinder or going out from the cylinder. It is, in operation and effect, a single valve, and its action "against the pressure" of the water, or in returning to its normal position by means of the unbalanced piston, is the same whether the flow be towards or from the cylinder. The unbalanced piston, together with leakage holes through the disks which form the valve, is the means whereby the flow of water to or from the cylinder is gradually stopped and started in the reverse direction through the passage, H3, when the car is at the bottom or top of the shaft. A passage for liquid to and from the cylinder wherein is arranged a shut-off or safety valve held normally open by the expedient of an unbalanced piston, substantially as shown in the drawings and described in the specification, is the important factor in this claim. When a hydraulic cylinder is constructed so that there is one water passage for the flow towards such cylinder and another for the outward flow, a safety valve in either to stop the

flow was in the prior art. The idea of the patent in suit, so far as concerned the matter of claim 6, was a single water passage for the flow to and from the cylinder, and in that passage a single valve to stop the flow in either direction when the car was about to pass the proper limit at the top of the shaft in going up or at the bottom in going down. Apart from anything in the prior art, this would seem to be the sense of the claim in view of its terms and of the drawings and specification. In the construction of appellants there is no passage for water to and from the cylinder which contains any shut-off or safety valve. In that construction there are two valves, operated by a common stem; or a double valve, one part of which closes a passage for the exit of water from the cylinder while the other part is adapted to close another passage for the flow to the cylinder. While the flow through the inlet passage is stopped by one of these valves, the outlet passage is unobstructed. The inlet passage is closed by the valve appropriate to it when the car is at the top of the well, the other valve being meantime withdrawn, so that, so far as that valve is concerned, the outlet passage is entirely open. The reverse of this occurs when the car is at the bottom of the well. Neither an unbalanced piston nor any instrumentality other than the main change valve is needed or used to start the flow of water to the cylinder when the car is at the bottom, or from it when the car is at the top. In this construction the safety or shut-off valves are not in the water passage from the main valve to the cylinder. In this construction, as already said, there is no passage for the flow of water to and from the cylinder in which is arranged a safety or shut-off valve. Nor is there apparently anything answering to the leakage holes which seem to be functional in the shut-off or safety valve as shown in the patent in suit; nor is there apparently anything which has a function equivalent to that of the unbalanced piston as described in the patent in suit. These latter suggestions seem not inappropriate in connection with the important point of distinction, namely, that appellants have not arranged a shut-off or safety valve in a passage through which the water flows in both directions between the main valve and the cylinder. Construing claim 6 with reference to the invention described, the construction of appellants, so far as concerns that claim, would not appear to be within the monopoly of the patent in question.

The third error alleged by appellants concerns the title of appellees to the patent numbered 328,614. The title comes to them by divers assignments. Copies of the record in the patent office of such assignments were put in evidence, and no other proof of the original instruments or the signatures thereto was made. It is the want of such additional proof, rather than the incompetency, for any purpose, of the copies from the record in the patent office, which appellants insist on. Section 4898 of the Revised Statutes of the United States is in words following:

"Sec. 4898. Every patent or any interest therein shall be assignable in law, by an instrument in writing; and the patentee or his assigns or legal representatives may, in like manner, grant and convey an exclusive right under his patent to the whole or any specified part of the United States. An as-

signment, grant, or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the patent office within three months from the date thereof."

Section 892 is in words following:

"Sec. 892. Written or printed copies of any records, books, papers, or drawings belonging to the patent office, and of letters patent authenticated by the seal and certified by the commissioner or acting commissioner thereof, shall be evidence in all cases wherein the originals could be evidence; and any person making application therefor, and paying the fee required by law, shall have certified copies thereof."

Section 4898 does not require that any instrument in the chain of title to a patent shall be recorded, but all such assignments may be recorded. The sense—the essential significance and intent—of this section is that the record or official copy of any assignment shall give to any person interested the prima facie assurance that an original assignment was made in terms as shown in the record, that such instrument was subscribed as shown, that it was delivered, that the signature thereto is the genuine signature of the assignor, and that such assignor had an assignable interest according to the purport of the instrument. These are the inferences—the prima facie inferences—which any person interested is authorized and authorized by law (that is to say, by the section itself) to draw. The laws of thought are not suspended when the inquiry arises in a court of justice. The selfsame inferences spring up prima facie when a litigant in a patent case, being called on to prove that A. assigned to B., produces a writing, purporting to show on its face an assignment from A. to B., which is proven to be a copy of a record in the patent office. The record of assignments in the patent office is a record "belonging to the patent office," within the literal terms of section 892. But, in the absence of that section, and on the general principles of evidence, a paper purporting to be a copy of a record in the patent office could be proven to be such copy by the sworn testimony of the person who made it, or of a person who had compared it with the original record in the patent office. The view here stated as to the prima facie probative force of a copy from the record of an assignment in the patent office has been substantially taken in many reported decisions. Brooks v. Jenkins, 3 McLean, 432, Fed. Cas. No. 1,953; Parker v. Haworth, 4 McLean, 370, Fed. Cas. No. 10,738; Lee v. Blandy, 1 Bond, 361, Fed. Cas. No. 8,182; Dederick v. Agricultural Co., 26 Fed. 763; National Folding Box & Paper Co. v. American Paper Pail & Box Co., 55 Fed. 488. The same theory as to the probative force of records made by authority of law in the case of alienations of other property is recognized with more or less definiteness in the following cases: Sudlow v. Warshing, 108 N. Y. 522, 15 N. E. 532; Chamberlain v. Bradley, 101 Mass. 188; Ward v. Fuller, 15 Pick. 185; Lane v. Bommelmann, 17 Ill. 95; Seeley v. Wells, 53 Ill. 120; People v. Lee, 112 Ill. 113; Railway Co. v. Trayes, 17 Ill. App. 136; Sampson v. Noble, 14 La. Ann. 347; Evanston v. Gunn, 99 U. S. 660; Navigation Co. v. Amsden, 25 Ill. App. 307.

Said the supreme court of Massachusetts, speaking of the probative force of a copy of a deed from the public registry of deeds, in Chamberlain v. Bradley, supra:

"Between natural persons, the production of a copy is evidence of the ex·ecution of the deed by the person whose deed it purports to be, of its delivery, of its due acknowledgment; and, in the absence of other evidence, of the seisin of the grantor.  This involves the presumption or inference of fact (1) that the seal was the seal of the grantor; (2) that it was affixed by him, or by his authority; (3) that he signed his name, or authorized it to be signed by him or in his presence; (4) that it was the grantor who made the acknowledgment; (5) that the certificate of the magistrate is genuine; and (6) that the grantor was seised of the land which the deed purports to convey."

It is not here meant that a plaintiff in ejectment could make out a prima facie case by putting in evidence a copy from the record of the last deed in his chain of title.   The presumption that the assignor of a patent, for instance, was vested with the interest assigned on the face of the instrument, or that the grantor in a land conveyance was seised of the estate transferred on the face of the deed, in the absence of other proof tracing prima facie the title of such assignor to the original source, or to a source which was common to the contending litigants, would doubtless be sufficiently rebutted in the case of a patent by the adverse user, in the case of land by the adverse possession.

In Navigation Co. v. Amsden, 25 Ill. App. 307, and in Sampson v. Noble, 14 La. Ann. 347, records in the collector's office were used as prima facie proof to show the ownership of a vessel.   In a case where the litigant against whom the copy is offered was himself the assignee in the assignment to be proved, and may, for that reason, be assumed to have the custody of the original, an objection that no notice was given to him to produce the original will be good, but such objection must specify the want of notice as its ground.   On the other hand, if a litigant should offer a copy from the patent office to prove an assignment wherein he himself is assignee, and presumptively in possession of the original, an objection specifically on the ground that he should produce, or show the loss of, or account for, the original, would likewise be good.   Draper v. Hatfield, 124 Mass. 53; Stockwell v. Siloway, 105 Mass. 517; Samuels v. Borrowscale, 104 Mass. 207; Blanchard v. Young, 11 Cush. 345; Palmer v. Stevens, 11 Cush. 147; McNichols v. Wilson, 42 Iowa, 385.   The record in the case at bar shows the following note of the objection made when the copy from the patent office of the first in the chain of assignments was introduced in evidence before the commissioner:

"Counsel for defendants objects to the introduction of the said paper as an exhibit for its admission in evidence, on the ground that the original of which it is certified to be a copy, so far as the purposes of the suits which defendants' counsel represents, is immaterial, indefinite, incompetent, and not proven."

This objection, in terms, is that the record in the patent office is "immaterial, indefinite, incompetent, and not proven."   "The original of which" the paper put in evidence was "certified to be a copy" is the record in the patent office, not the original writing of assignment.   The meaning of the objection is that the record in the patent office is "immaterial," etc.   This objection was repeated, or rather referred to, in connection with each succeeding assignment in the chain of title as the copy from the patent office was put in

evidence. There was no call for any original writing of assignment, nor was any objection made on the ground that any original writing of assignment was not produced, or its loss accounted for. The matter was not brought in any way to the attention of the circuit judge, nor is it asserted as error that any copy from the patent office was admitted over the objection that the original writing was not produced, or its loss accounted for. The only question presented by the record is the prima facie probative force of the patent office record of an assignment. In City of New York v. American Cable Ry. Co., 9 C. C. A. 336, 60 Fed. 1016, the federal court of appeals at New York, following an obiter dictum by the federal court of appeals at Boston in Paine v. Trask, 5 C. C. A. 497, 56 Fed. 233, decided that under the sections above quoted from the Revised Statutes of the United States a certified copy from the records in the patent office would not prima facie prove the assignment without a further showing as to the execution of the original instrument. It is argued by the learned writer of the opinion that the statute does not require an assignment to be recorded, that the original is not left in the custody of the patent office, and that no certificate of acknowledgment or proof of execution is required by the statute to be made in connection with such instrument. But the line of reasoning upon which the courts have developed the rule already stated does not involve any one of the conditions named. The statute makes it the duty of the commissioner of patents to record assignments (meaning assignments that are genuine). He has no authority to record a spurious instrument. A spurious assignment recorded in the patent office would not be in law a record of that office. The record of an assignment is, in law, tantamount to a finding or certificate by the commissioner that the original is genuine. It matters not that the commissioner may act on the mere assumption that whatever paper of this kind is presented for record is genuine. He is a public officer, charged by law with the duty of recording only such as are genuine. The law attaches to his act in making the record the prima facie presumption that the instrument copied upon his record book is entitled to record; that is to say, is genuine. The argument that a spurious assignment may be mistakenly put upon the record might be urged against the policy of the statute, but not against the obvious sense of it. Such an argument might also be urged against the ordinary statutes for recording deeds, for it would be no more difficult to secure the recording of an instrument with a spurious certificate of acknowledgment than an instrument with no acknowledgment at all, but with a spurious signature. All such enactments proceed upon the assumed integrity of men on the average, as civil institutions in general in this country assume a fair degree of integrity and intelligence in the average man. This court cannot accede to the view announced in City of New York v. American Cable Ry. Co., supra. The rule, as understood and acted upon prior to that decision, is considered by this court to be law. For 52 years (Brooks v. Jenkins, supra, was decided in 1844) that rule has prevailed. As pointed out by Judge Coxe in National Folding Box & Paper Co. v. American Paper Pail & Box Co., supra, a holding that the patent-office

record of an assignment shall have no force as prima facie proof of the original writing would often entail great and useless expense, if not an entire defeat of the rights of the complainant in a patent case. A spurious or counterfeit assignment put of record in the patent office would be easily and certainly detected by any person interested in the inquiry, especially in the case of any patent of real value. The possible gain from such a rascality would not be worth the risk. The complainant in a patent suit is ordinarily making actual use of the patent. What may be called his possession of the patent property is usually open and notorious. It is no hardship upon an infringer who, claiming no right in himself, proposes to dispute the showing of the patent office on the matter of title, to require from him such proof as may at least raise a fair presumption that the original of some assignment shown of record in the chain of title is spurious.

In accordance with the prevailing opinion of the judges on this hearing, the adjudication appealed from is affirmed in all respects except as to the sixth claim of patent No. 328,614, and as to that claim the decree is reversed, with the direction that the order of reference be to that extent vacated, and the bill to that extent dismissed for want of equity; and the cause is remanded to the circuit court.

BUNN, District Judge. In my view, the question whether or not the decree appealed from be interlocutory or final is not necessarily involved. I therefore express no opinion on that point. In other respects I concur in the foregoing opinion and in the conclusion above announced.

WOODS, Circuit Judge (dissenting). There is manifestly no present necessity for considering whether the decree appealed from is final or interlocutory, but that it is interlocutory only has been determined too often to admit of further question. Barnard v. Gibson, 7 How. 650; Humiston v. Stainthorp, 2 Wall. 106; Iron Co. v. Martin, 132 U. S. 91, 10 Sup. Ct. 32; McGourkey v. Railway Co., 146 U. S. 536, 13 Sup. Ct. 170; Latta v. Kilbourn, 150 U. S. 524, 14 Sup. Ct. 201; David Bradley Manuf'g Co. v. Eagle Manuf'g Co., 6 C. C. A. 661, 57 Fed. 980, and 18 U. S. App. 349; Dudley E. Jones Co. v. Munger Improved Cotton Mach. Manuf'g Co., 1 C. C. A. 668, 50 Fed. 785, and 2 U. S. App. 188; Richmond v. Atwood, 2 C. C. A. 596, 52 Fed. 10, and 5 U. S. App. 151; Marden v. Manufacturing Co., 15 C. C. A. 26, 67 Fed. 809, and 33 U. S. App. 123; Bissell Carpet-Sweeper Co. v. Goshen Sweeper Co., 19 C. C. A. 25, 72 Fed. 545; Lockwood v. Wickes, 75 Fed. 118; Brush Electric Co. v. Western Electric Co. (this court, Oct. 5, 1896) 76 Fed. 761; Raymond v. Baking Powder Co. (this court, Oct. 12, 1896), 76 Fed. 465.

What shall be the effect of the affirmance or reversal of an interlocutory order can properly be considered when the question arises out of subsequent action of the court, of which an instance is found in the case of Bissell Carpet-Sweeper Co. v. Goshen Sweeper Co., supra, where, after affirmance by the court of appeals, the circuit

court, without proof or suggestion of any change in the situation after the decree was entered or after it was affirmed, modified the injunction in material respects, and on a second appeal it was held that the modification ought not to have been made. That, I think, is the extent of the ruling, though there are dicta in the opinion to the effect that, after the affirmance, the circuit court had no power to alter the decree, which, when appealed from, was conceded to be only interlocutory. I agree with the writer of the principal opinion in this case that "there is no power in the court of appeals whereby its affirmance, or approval on review, of a decree of the circuit court, can give a finality to that decree which it did not have when entered of record in the circuit court." In the case of Andrews v. Pipe Works, 24 U. S. App. 81, 10 C. C. A. 60, 68, and 61 Fed. 782, 790, this court, in an opinion concurred in by Justice Harlan, said:

"Notwithstanding the rule in respect to final judgments, that on a mandate from the supreme court affirming a decree the circuit court must execute its decree as affirmed (Durant v. Essex Co., 101 U. S. 555), it has been decided that the affirmance of an interlocutory order of injunction does not operate to deprive the circuit court of its inherent power to suspend the injunction whenever the ends of justice call for the exercise of such power (United States Electric Lighting Co. v. Edison Electric Light Co., 11 U. S. App. 600, 8 C. C. A. 200, and 59 Fed. 501); and by the same principle, we think, a decision on appeal reversing or modifying such an order should be deemed conclusive only in respect to the particular order reviewed, and in the further progress and upon final hearing of the case in the circuit court the opinion and ruling on the appeal should be regarded as advisory only,—more or less controlling, according to the circumstances. In this case the circuit court looked upon the mortgage of the appellants as a nullity. For the reasons given in the opinion, this court reached the opposite conclusion; but if, instead of the positive conviction declared, we had entertained grave doubt upon the point on which the question turned, it would have been our duty to rule just as we did, because an injunction before final hearing should be allowed only when the right to it is clear. Standard Elevator Co. v. Crane Elevator Co., 9 U. S. App. 556, 6 C. C. A. 100, and 56 Fed. 718. It is plain, therefore, that our decision did not involve, and should not be regarded as, a technical and final adjudication, for the purposes of the case, of the points which we considered in reaching our conclusion that the order of the circuit court was wrong, or of the questions propounded in the petition for a rehearing."

While in that case the order appealed from was only a temporary one, the decision suggests what it seems to me must become the practice in respect to interlocutory injunctions or orders which result from a hearing on the merits. Indeed, that is the scope of the decision in United States Electric Lighting Co. v. Edison Electric Light Co., supra. Such orders, being interlocutory, if not appealed from, it is certain, remain subject to modification or revocation; and, if appealed from and affirmed, it must still be true, from their very nature, that they remain interlocutory, and, technically speaking, not beyond the power of modification by the circuit court until made final by a further order or decree. But, as a matter of practice, the right of the circuit courts to make such modifications, without new proofs showing the necessity or propriety of so doing, on grounds not presented and considered on the appeal, ordinarily will not be recognized, and on a second appeal the original order as affirmed, if modified or set aside after affirmance, will be summarily reinstated,

unless the court of appeals shall choose to reconsider the merits, as unquestionably it would have the power to do. On the other hand, if an interlocutory order is reversed because upon the face of the bill or upon the proofs the suit cannot be maintained for want of equity, the mandate, as in Richmond v. Atwood, and in Dudley E. Jones Co. v. Munger Improved Cotton Mach. Manuf'g Co., supra, may be that the order for an accounting be set aside, and that the bill be dismissed; but it was not decided in those cases, and does not follow, that the circuit court, notwithstanding such a mandate, may not, upon request, permit an amendment of the bill, if that be necessary and possible; or, upon proper showing, allow the introduction of new or additional evidence. All this seems to me to be the logical outcome of the legislation whereby congress has authorized appeals from interlocutory orders; and, instead of involving an "impossible and absurd result," the practice, under limitations always within the discretion of the courts, will prove in the highest degree salutary, because in every suit, so long as it remains pending, it will be possible, in the light of later decisions of other courts, and especially of the supreme court, or of further investigation by the same court, to correct any error of law which may have intervened, and likewise to give the parties the benefit of the discovery of new evidence, without formal proceedings to review or to open the decree for that purpose. The practice suggested involves no undue prolongation or increase of litigation, to the injury of the public.

It is said that "this court has no power to review its own adjudications," but, while true in respect to adjudications upon appeals from final decrees or judgments, except upon petitions for rehearing, the proposition is not, and cannot reasonably be deemed, applicable to decisions upon appeals from interlocutory orders. The same is true of the proposition, taken from the opinion in the case of the Bissell Carpet-Sweeper Co., that "the judicial function of considering involves the function of determining." That is unquestionable, but it does not follow, under a statute authorizing the review of interlocutory orders, pending further proceedings in the court below, that in such cases "the decision of an appellate court is final." The determination of a final matter is final, but a decision upon an interlocutory matter ex vi termini must be interlocutory.

Coming to the merits of the appeal, the third specification of error presents the question whether the complainants had proved title to patent No. 328,614. The proof made consisted in certified copies of the record in the patent office of assignments purporting to have been made by Reynolds, the patentee, to the Crane Bros. Manufacturing Company, and by that company to the Crane Elevator Company, and by the last-named company to James H. Raymond, trustee. For the purpose of showing that the alleged assignments had been recorded in the patent office, as provided in section 4898 of the Revised Statutes, the copies were admissible in evidence, over the objection of incompetence and irrelevancy; but that they constituted no proof of the execution or genuineness of the original instruments seems clear both on principle and authority. It has been so declared in well-considered cases by the courts of appeals in both the First

and Second circuits (Paine v. Trask, 5 C. C. A. 497, 56 Fed. 233, and 5 U. S. App. 283; City of New York v. American Cable Ry. Co., 9 C. C. A. 336, 60 Fed. 1016); and, even if those decisions were doubtful, this court ought not now to assert a different rule.    But it is to be observed in this instance that the assignments of which copies were put in evidence were in the possession of the complainants, or their trustee; and, that being so, even under the rule in respect to office copies of conveyances of real estate under the registry laws, the production of the originals, or an excuse for the failure, was necessary.    As the rule is stated in Ward v. Fuller, 15 Pick. 185, 187, cited in Chamberlain v. Bradley, 101 Mass. 188: "Where the party relying upon a deed of conveyance is the grantee, or person who is entitled to the possession of it, he must produce the original, or lay a foundation, in the usual manner, for the production of secondary evidence."

I am of opinion that claim 2 of patent No. 328,614 shows no invention.    An exactly similar construction, it is admitted, existed in the prior art, and if it be true, as said, that the prior device "was at once an air and water pipe," it was no less an anticipation.    It is not shown that air and water both do not pass off through this pipe.    They certainly would but for the presence of the bottom connection, covered by claim 4; and the fact that the escaping water is diverted through a new channel does not make of the unchanged old device a new invention.

That claim 4 contains nothing patentable is so evident that counsel for appellees are constrained to insist that, while claim 2 is for the air escape per se, claim 4 is for the combination of the bottom discharge and air escape with the reversing valve.    The wording of the claim admits of no such interpretation.    Railroad Co. v. Mellon, 104 U. S. 112; Day v. Railway Co., 132 U. S. 98, 102, 10 Sup. Ct. 11; Wollensak v. Sargent, 151 U. S. 221, 227, 14 Sup. Ct. 291.

The third claim,—for the stop valve,—if not anticipated by the prior art, as I am inclined to think it is, especially by the Curtis patent, No. 314,167, is certainly subject to a narrow construction, and is not infringed by the valve of the appellants, which is different both in construction and mode of operation.

In respect to patent No. 456,122, it is agreed that the invention is covered by the Smith patent, No. 334,907, and is anticipated thereby, unless it has been established that Reynolds was in fact the first inventor.    The burden of proof in that respect was upon the appellees, and, unless the proof is clear and convincing, the prior patent should prevail.    Smith's application was filed December 15, 1885, and the patent issued January 26, 1886.    Reynolds filed his application January 26, 1887, and obtained his patent July 14, 1891. The evidence is not only not conclusive that Reynolds was the first inventor, but, as I view it, preponderates in favor of Smith's priority.    Reynolds' own testimony on the point, together with that of Smith, is the most direct and satisfactory.    As witnesses they were both inclined to favor the appellees, and whatever there is in their testimony favorable to the appellants should be given full credence.    They agree that in December, 1884, Reynolds made a

statement to Smith of his invention for which patent No. 317,202, in which one end of the cables is connected with weights, was afterwards issued, upon an application filed January 5, 1885; and that at the same time Smith explained to Reynolds that he had invented a similar device, in which both ends of the cables were to be connected with the car. Smith also told Reynolds, as the latter testifies, that he had sent drawings of his design to his attorney, and wondered that he had heard nothing from the patent office. This strongly corroborates the testimony of Smith that he had sent such drawings to the attorney; but whether he had done so in fact is a collateral and comparatively immaterial question. Smith and Reynolds, in December, 1884, were under no mistake in respect to what each claimed to have invented, their devices being substantially alike in respect to levers, and in the fact that the cables of both were to run with the cars, but different in that the cables of Reynolds were attached at the upper end to weights, and those of Smith were attached at both ends to the car. With this proposition the subsequent conduct of both Reynolds and Smith is consistent. In the belief of both, probably, and certainly in the mind of Reynolds, the chief feature of invention in both designs was the double cable attached to the double lever in the car and running with the car, and in that view Reynolds feared conflict between them, and obtained of Smith a written agreement not to prosecute, without Reynolds' consent, an application for a patent upon his design. His own application for a patent Reynolds promptly presented, claiming the cables with weights, but making no claim for cables attached at both ends to the car, nor any suggestion, either in the specification or drawing, that they could be so attached; and on that application he accepted the patent awarded him (No. 317,202), though he knew, by practical experiments made as early as February or March, 1885, that the preferable method was to attach both ends of the cables to the car. Had he not been conscious that that mode of construction was not his, but was the conception of Smith, it is incredible that he would not have described and claimed it as his own, either by an amendment of his application, after the value of the conception had been demonstrated by experiment, or by a new and independent application. On the contrary, through a period of two years or more he made repeated statements, in some instances to parties proposing to invest money on the faith thereof, to the effect that Smith was the first inventor; and, not until persuaded thereto by others interested, did he make the application wherein he claimed as his own the idea of attaching both ends of the cables to the car, and in respect to that application he afterwards made affidavit disavowing his right in that particular. He testifies that that affidavit contains the language of another, and not his own, but the force of that assertion is removed by the further statement and admission: "I then believed, and now believe, the statements were true." It is not a sufficient or satisfactory explanation of his repeated declaration, contrary to his testimony, that they were made on the faith of what Smith had told him. What he had done and when he had done it were facts within his own knowledge; and when,

in December, 1884, he was told by Smith of the latter's mode of attaching the cables, he knew whether that conception was then new to him; and if, in fact, in the September before, he had thought it out, and, as is now asserted, had produced a drawing wherein it was illustrated, in connection with weights, he would have so asserted to Smith at the time, and would not in silence then, and by repeated declarations afterwards, have conceded Smith's priority in that particular, and certainly would not have gone so far as to pay a price for an option to buy Smith's patent when issued, and to bargain for delay by Smith until he could patent his own conception. The drawing, which is produced as an illustration of Reynolds' first conception,

is not the original, but an alleged copy, made after the date of Smith's patent. If conceded to be a true copy of a genuine original, it is of obscure meaning, and falls far short of showing an attachment of the cables to the upper parts of the car; and upon the entire evidence I am satisfied that, if in September, 1884, Reynolds, as he has testified, made a drawing like the alleged copy, there was then in his mind no conception beyond what is shown in his patent No. 317,202, for which he applied within a few days after his talk with Smith. The rule is that a drawing may be the foundation of a claim of priority of invention "if it be sufficiently plain to enable those skilled in the art to understand it." Loom Co. v. Higgins, 105 U. S. 580, 594. There is in the drawing in question, as the fac simile in the margin demonstrates, no sign of a connection between the end of one of the cables and the top of the cart, and, if the lines or scratches which are said to indicate such attachment of the ropes to the upper end of the car can be said to indicate anything more than other meaningless lines apparent in the drawing, they may fairly be said to suggest ropes extending from one of the weights to the car, and from one weight to the other, designed rather for the purpose of steadying the weights than to indicate that they may be dispensed with, and the cables connected directly with the car. If Reynolds, when he produced the drawing, intended to illustrate such direct connection, and so explained to members of his family, there is no evidence of the facts, unless it can be found in his own uncertain testimony; and manifestly he is not a witness whose unsupported word, however explicit, should prevail against a patent which, in numerous

instances and once upon deliberate oath, he has declared entitled to preference over the later patent granted to himself.

The testimony of Smith is clear, and, by reason of his avowed and evident friendliness to the appellees, is the more convincing. Besides, he is strongly corroborated by Wells, Cartright, and others, and by circumstances of which there can be no doubt; and, as it seems to me, there can be no other reasonable conclusion, upon the entire contention over these patents, than that Smith first conceived the idea of cables attached at both ends to the car, that he communicated the idea to Reynolds; and that when, in February and March, 1885, the conception was reduced to practice in the shops of the Crane Company, in whose service both Smith and Reynolds were then employed, and in the Memory Building, in Chicago, it was the idea of Smith, and not of Reynolds, and was so understood at the time by Reynolds himself.    To that effect is the explicit testimony of Wells, who gives a detailed and clear account of the facts, showing that it was upon his insistence that Smith's idea, illustrated by drawings which Smith produced, was put to the practical test. That Smith's design was in fact so used the circumstances make probable, and the only evidence to the contrary is the testimony of Reynolds, discredited by his prior conduct and statements, and by his affidavit.

Stress has been laid upon the decision against Smith in the interference with Baldwin, but, aside from the lack of relevancy of that matter to the present issue, it is clear enough that the contest in behalf of Smith's patent was purposely allowed to go by default,—Smith himself refusing to testify in support of it,—because his employers, who owned the patent, had on the other side an equal or greater interest.    Besides, if in respect to the matter now in dispute Baldwin was prior to Smith, he was also prior to Reynolds.    But, if Reynolds' priority were conceded, it would be a grave question whether the holders of the patent are entitled to relief in equity. Their rights, I suppose, are not better than Reynolds' would be if he had made no assignment of his title; and, it being clear that he entered into an arrangement with Smith, the evident purpose of which was to enable each to obtain a patent on similar devices without an interference with the other, ought either of them, or the assignee of either, to be allowed a standing in equity?    I think not. In respect to the public, and to the assignees of either, the agreement which they made was essentially fraudulent.    Letters in evidence demonstrate that solicitors so understood when prosecuting Reynolds' application for a patent; and, but for the fact of the agreement, and the subsequent manipulation by which a declaration of interference between Reynolds' application and Smith's patent was improperly prevented, it is probable that this litigation would not have occurred.