NEW YORK PAPER-BAG MACHINE CO. *v.* UNION PAPER-BAG MACHINE CO.[1]

(*Circuit Court, E. D. Pennsylvania.* November, 1887.)

1. PATENTS FOR INVENTIONS—AGREEMENT TO ASSIGN—RECORD—NOTICE.

There is no authority under the patent laws to record an agreement for a future assignment of a patent not yet issued, and if recorded it does not amount to notice.

2. SPECIFIC PERFORMANCE—LACHES—NOTICE.

Specific performance of a contract to assign a patent will not be decreed when the complainant has been guilty of laches, unless the defendant has acquiesced in the delay; and when specific performance of such a contract is sought after a subsequent assignment of the patent to a third party, the complainant must show that he performed, or tendered performance of, his part of the contract, and that the assignee had notice of his contract.

In Equity.

*Frederic H. Betts* and *Wayne MacVeagh,* for complainant.

*Francis T. Chambers* and *George H. Harding,* for respondent.

BUTLER, J. On the twenty-sixth day of January, 1880, Leinbach & Wolle, copartners in trade, entered into a contract with Mark L. Deering, in the following words:

"That whereas the party of the first part, (Leinbach & Wolle,) and the party of the second part, (Deering,) have each and severally applied to the United States patent-office for a patent covering a new style of paper bag, known as the 'Square Satchel-Bottom Bag,' and whereas these applications have been adjudged in interference one with the other; now, therefore, it is mutually agreed by and between the parties hereto as follows, to-wit: Party of the first part, for and in consideration of the sum of one dollar in hand paid by party of second part, the receipt whereof is hereby acknowledged, and also in consideration of the covenants and agreements on the part of the party of second part to be performed and kept, hereby agree to withdraw their application for said patent aforesaid in favor of the said Mark L. Deering, party of second part, so that the patent-office may at once allow a patent to him; and, furthermore, said party of first part agree to have issued to said Deering ten thousand dollars of the full-paid stock of a company about organizing in New York, to be styled the 'New York Paper-Bag Machine & Manufacturing Company,' or in lieu thereof, at their option, to pay him the sum of one thousand dollars in cash. Party of the second part, for and in consideration of the covenants and agreements of the party of first part to be performed and kept, and also for one dollar in hand paid, the receipt whereof is hereby acknowledged, hereby agrees and binds himself to assign over to the 'New York Paper-Bag Machine & Manufacturing Company,' when said company shall have been organized as aforesaid, the patent which shall be granted to him by the United States patent-office, covering the said new square satchel-bottom bag as aforesaid, with any and all future patents which he may be able to obtain covering paper bags, and he also agrees to apply for an interference with the patent heretofore granted to one Daniel Appel, of Cleveland, Ohio, the aforesaid company to pay all expenses, and, when a patent has been allowed him on that claim or claims, to also assign that patent over to the above named company.

"In witness whereof the parties have hereunto set their hands and seals."

[1] Reported by C. Berkeley Taylor, Esq., of the Philadelphia bar.

This agreement was signed by the parties, duly acknowledged, and recorded in the patent-office.

Leinbach & Wolle promptly proceeded to form the contemplated company; but encountered great difficulty in persuading others to embark in the enterprise; and it was not until the sixth day of December, 1884, that they succeeded in organizing a company.

Deering, although anxious for a speedy execution of the contract, exhibiting much uneasiness and dissatisfaction with the delay respecting it, *appeared* to acquiesce; and fully justified Leinbach & Wolle in believing he did. He did not, however; and before many months had elapsed he sought other purchasers. He applied to the defendants with this view, and continued to communicate with them from time to time, urging the purchase. On the first of February, 1881, he wrote as follows:

"*E. J. Howlett & Co.*, 520 *Commerce St.*, *Phila.*—GENTLEMEN, SIRS: Inclosed please find patent for improvement in manft. of paper bags. You may remember I called upon you in the summer of 1879; at that time my patent was with interferences with the Cleveland Paper Co.'s. I next wrote you a letter in August, same year, to which I received an answer dated Sept. 5, '79, saying you would buy my patent if awarded to me, and would give me more for it than any one else. I was again in Philadelphia the latter part of August, or the first of Sept., 1880; called at your place of business, but you were at the seaside at that time. This time I had the patent with me, as you will see it was issued May the 11th, '80.

"I suppose you are aware that the Cleveland Paper Co. have had some eight or ten patents issued to them on paper bags; all of them, however, is intended to avoid my patent. My atty. claims that they all are infringements upon mine, and that it is impossible for them to make a bag of that description without infringement with mine. On Saturday last, Jany. 29th, I made it my special business to go in their machine-shop; there I saw, as I were already informed, a machine for making a bag, which is a face simlar of mine; but, if course, the clame the have so many patents the do not infringe upon me, and I clame it is impossible for them to make a square satchel-bottom bag without infringin on me. I am informed by good authority that the intent to buil a number of those machines, and manufacture the bag *the clame in spite of me*. Now, if such is the case, it will not pay me to put an injunction upon them, as I am not in the bag business, *but I really want to see some one do so*. Now, I propose to assign to you my patent for five hundred dollars, which will let me out just about clear.

"You are the only party who they are afrade of, and for that reason I hope that you will take this off my hands. Then I will keep still, and let them go ahead, and when the proper time comes I hope you will straghten them out good. Hoping you will give this proposition due consideration, and hear from you soon.         Very truly yours,        MARK L. DEERING."

On the twentieth of April following, the defendant took an assignment, on the terms proposed; and three days later recorded it.

Leinbach & Wolle continued their efforts for the formation of a company. For more than a year, however, after this assignment, they had no communication with Deering, nor with his assignee, the defendants. They were aware of Deering's uneasiness and eagerness for prompt performance of the contract, of his poverty, and anxiety to realize something upon his invention. They continued to write him, stating their failures

and prospects, apparently seeking to hold him steady respecting his engagements. He, however, made no reply; and they were unaware even of his whereabouts. About a year later, in April, 1882, Leinbach & Wolle, having seen the record of the assignment, tendered the defendants $1,200, and demanded a transfer of the patent. This being refused, they hunted up Deering, and, on the twenty-seventh of September, tendered him the sum named in the contract, and demanded an assignment. He also refused, on the ground that he had nothing to assign. On the third of October, 1884, the defendants commenced suit against Leinbach & Wolle for infringement of the patent. On the sixth of December following, Leinbach & Wolle succeeded in forming a company. Addressing themselves again, very earnestly and persistently, to Deering, and offering him $10,000 of stock in this company, they eventually succeeded in inducing him to accept the offer, and execute an assignment to the company.

The bill sets forth these facts, (about which there seems to be no room for dispute,) and in addition thereto alleges a verbal understanding between Leinbach & Wolle and Deering, contemporaneous with the written contract, or nearly so, that the contemplated company should not, or need not, be formed until after the completion of machinery (then in process of construction) for the manufacture of bags; further avers that the defendants had knowledge of Deering's previous contract, when taking their assignment; and that the assignment was obtained through fraudulent misrepresentations, respecting Leinbach & Wolle's ability to carry out their undertaking.

It is thus seen that the plaintiff's case is, or appears to be, presented in a double aspect: (1) As founded on the legal title to the letters patent, derived through Deering's assignment of 1885; the relief sought being the cancellation of the alleged fraudulent and inoperative assignment, an apparent incumbrance or cloud upon the title, from which litigation and trouble is threatened. (2) As based upon an equitable title, arising out of Deering's original contract with Leinbach & Wolle; the relief sought being the specific execution of this contract, through an assignment of the legal title by the defendants.

The first aspect or proposition is readily disposed of. The alleged fraud on which it rests has no existence. The bill founds it on the alleged knowledge of the previous contract, when taking the assignment, and the alleged misrepresentations to Deering. But it is quite clear that Deering had a right to sell the legal title which remained in him, and the defendants a right to purchase, notwithstanding they had the information imputed. The facts as stated in the bill, do not, therefore, constitute a fraud. If Deering was imposed upon in parting with his interest, (of which we do not find any reliable evidence,) he alone could complain of it.

As respects the second aspect or proposition, a question of law lies at the threshold, about which, however, there seems little room for controversy. Ordinarily equity cannot be invoked for the specific performance of contracts respecting personal property; an action at law for the breach

being held to afford an adequate remedy. In 2 Pars. Cont. 522, it is said:

"This distinction, in equity, regarding specific performance, is well established everywhere."

In Bisp. Eq. § 368, it is said:

"In regard to personalty it is a general rule that equity will not decree specific performance of contracts respecting this species of property, for the reason that compensation in damages is ordinarily sufficient."

In special instances, however, where the circumstances are extraordinary, either as respects the property or the situation of the parties, where an action for damages would not afford an adequate remedy, equity may be invoked for specific performance. It is unnecessary to dwell upon the subject. The cases cited by counsel: *Secombe* v. *Campbell*, 2 Fed. Rep. 357; *Newell* v. *West*, 13 Blatchf. 114; *Pontiac* v. *Merino Co.*, 31 Fed. Rep. 286, 289, (to which may be added 2 Pars. Cont. 534, and *Thombleson* v. *Black*, 1 Jur. 198,) show that letters patent and copyrights fall within the exception to the general rule stated.

Starting with the fact that Leinbach & Wolle took an equitable title, by the contract of 1879, it must appear (to entitle the plaintiffs to a decree) that they faithfully performed (or tendered performance of) their part of the contract; and also that the defendants had notice of its existence, when taking the assignment.

As respects the first question, it must be remembered that the contract to which we allude is the one in *writing*. The alleged verbal understandings are of no consequence, except to the extent they may tend to show acquiescence of Deering in Leinbach & Wolle's delay, previous to April, 1881, when he assigned to defendants. That there was delay within this period, such as would be fatal to the claim for specific performance, in the absence of acquiescence by Deering, seems quite clear. Ordinarily time is not of the essence of contracts respecting either real or personal property. In special instances, however, it is. Here the circumstances were such as seem to have required prompt action. The life of the patent was running, and the lapse of every month tended to diminish its value. No precise time was specified for performance. The assignment was to be made to a company, then "about organizing." It follows that Leinbach & Wolle were entitled to a reasonable period to organize the company, and no more. When organized, it was their duty to pay the consideration, and take the assignment. Some 15 months elapsed between the date of the contract with Leinbach & Wolle and the assignment of the defendants, a delay which, as before suggested, would be fatal to the plaintiff's claim, in the absence of proof that Deering acquiesced in it. He certainly led Leinbach & Wolle to believe he acquiesced; and the effect is the same as if he did. Subsequently to the assignment, however, there is no evidence that he justified Leinbach & Wolle in believing he continued to acquiesce. He declined to answer their communications, or to have any intercourse with them. His acquiescence after this event, however, would have been immaterial. The

defendants had his title, and stood in his stead. They did not acquiesce in the delay. Leinbach & Wolle must be treated as having notice of this assignment, which was promptly recorded; and yet they allowed a year to pass without offering to perform. It is no excuse to say they were unaware of the record. Besides, the conduct of Deering in breaking off communication with them was of itself notice, or at least an indication, that some change had occurred, and that the delay was no longer acquiesced in. The situation required a high degree of vigilance; the exercise of which would have led to a discovery of the assignment soon after its execution. Conceding that Leinbach & Wolle had a right to call for the execution of an assignment to themselves, instead of the company specified on paying the consideration, at the time of their tender in April, 1882, they were therefore too late, in our judgment, to be justified in demanding specific performance.

As respects the second question, *i. e.*, notice to the defendants of the previous contract, when taking their assignment from Deering, or of facts relating to the subject, sufficient to put them on inquiry, we think the difficulties in the plaintiffs' way are equally serious. The only evidence of actual notice is that found in the testimony of Deering. This is flatly contradicted by Howlett. In the absence of contradiction, however, the testimony could not be relied upon. The character of Deering, as developed by this case, and disclosed by its history, is such as to forbid reliance upon his statements. In addition to this, the circumstances under which he appears as a witness are very disparaging to him, and unfortunate, at least, for the plaintiffs. After he had divested himself of all possible interest in the patent, and had nothing therefore, to sell, (unless, indeed, it might be his influence or testimony,) he was tendered, and received $10,000 of the stock of the company, apparently as a consideration for executing another assignment. The plaintiffs knew, as well as he, that the paper would convey nothing, and be valueless. Their act has, therefore, rendered them liable to the damaging suspicion that their object was to induce Deering to cast his lot in with theirs, to identify himself with them, and consequently to afford them the assistance of his influence and testimony.

We have not overlooked the fact that the plaintiff's counsel appeal to the testimony of Pettee in support of the averment that defendant had actual and direct notice of the contract. We do not find, however, anything in this testimony to justify the appeal. Whether Pettee had information of the contract is not entirely clear. In view of all he says, we are inclined to think he had information from Deering of some connection between Leinbach & Wolle and Deering regarding the invention, though of an indefinite and uncertain character. All he had came from Deering; and all through his letters and testimony he asserts his disbelief of Deering, characterizing him as a man entirely unworthy of credit. Whether he informed the defendants of Deering's assertion, that he had a connection with Leinbach & Wolle, he says he does not know; that, as it was his duty, under his employment, to communicate such information, he presumes he did, but has no recollection about it; that he had several con-

versations with Mr. Howlett, but cannot recall that he did communicate this. Such is the substance of his testimony, and it falls short of proving that he did communicate what Deering told him about an assignment to Leinbach & W,olle, if Deering told him this. It is said the witness is an unwilling one, and we think this is true. We not only think him unwilling, but suspect his truthfulness. His communications with Mr. Howlett about the letters in evidence indicate that his integrity is of a low order. But the plaintiffs' case is not aided by this view. He is their witness, and we cannot assume that he had more information than he says he had, or that he communicated more than he declares he did. The burden of proof is on the plaintiffs. They must establish the facts on which their case rests, fully and clearly. This cannot be done by inferring and assuming that their witness is dishonest, and holds something back. But there are circumstances which justify a belief that the witness did not (in his conversations) communicate the information referred to, *i. e.*, the information that Deering said he had "assigned" to Leinbach & Wolle, if Deering did so inform him. We do not find this information, nor anything like it, in his written communication of April 5, 1880; yet this communication was made after (and not very long after) the conversation referred to, between Pettee and Deering. Pettee says the conversation was of about the same date as that of his letter to Leinbach, February 28. 1880. If he intended to communicate it, thought it worth communicating, why should he not have communicated it then? What greater probability is there that he did so verbally at another time?

The position taken that notice to Pettee, (if he had it,) is notice to the defendants, is clearly unsound, and requires no further attention. He was not the defendants' agent to purchase the patent, and had nothing whatever to do with it.

There is no implication of notice from the record of the contract. This record was unauthorized, and is consequently unimportant.

Had the defendants notice of facts sufficient to put them upon inquiry? As proof that they had, the plaintiffs appeal to the Pettee letters, and the testimony of Pettee himself. The testimony of Pettee, however, goes no further in this regard than the letters; and the only question, therefore, is whether the letters convey the required information. There are but two which are supposed to be important. In the first, dated April 5, 1880, a postscript is found containing these words:

"From a Bethlehem paper 1 see Leinbach. has applied for a charter. I saw Deering, and he talks tremendous big; but he is an infernal liar, and no reliance whatever is to be placed in him. Did you ever see him?"

This certainly communicates nothing of any value. The second is dated February 8, 1881, (before referred to,) and is as follows:

"Appel is trying to make a square bag, but I do not think it will amount to anything. I met Appel a short time ago, and he told me it was more difficult to make the bag than a satchel-bottom bag, and he was constructing the machine to make satchel-bottom bags if he fails to make this bag. Appel never succeeded in making any of the fancy bags *he has stolen.* He had a variety of about ½ doz. on the Deering plan, and made many efforts, at heavy

cost to Taylor, only to fail. *This reminds me that Julien mentioned to me that you were negotiating with Deering for his patents. I have not seen Deering lately. He became connected with a bag Co. in N. York. A company that Leinbach got up. Deering told me great stories about the company, or the machine they had to make the bag. I never believed one word about the wonderful machine. This company may have all come to grief. The bags are no good—no, I do not mean that, but I mean no machine will ever be gotten up to make them. If you can make any use of the patents for 'brush fence,' you might for a song purchase them. Deering, I think I told you long ago, is an infernal liar.*"

Here is information that Deering said he had "become connected with a bag company in New York; a company that Leinbach got up." This, however, is not information, nor a suggestion, that Deering had entered into a contract to transfer his invention to this company. Besides, no such company existed. Nor does it contain a suggestion that he had entered into such a contract with Leinbach & Wolle. Furthermore, the letter informs him that the writer does not believe there is any truth in what he has been told; and also informs him, in effect, that Deering still has control of the patent, for he is told he can buy it of him for a song. How could the defendants buy it of him, if he had already parted with, or lost control over it? Now, if this testimony stood alone, we think it would be insufficient to justify a conclusion that the defendants had information which should have put them on inquiry respecting the contract in question. When considered in connection with the testimony of Howlett, its insufficiency is even more apparent. This witness, who took the assignment, representing the defendants, testifies very positively that he had no information whatever on the subject from any source; that he took the assignment in entire ignorance of the contract, or of any circumstance tending to create a suspicion of its existence. His testimony is severely criticised, but we have seen nothing to justify disbelief of it. He was subjected to a lengthy, able, and somewhat embarrassing cross-examination, and while some discrepancies appear in his statements, they are not of such a character as to shake confidence in his truthfulness. On the other hand, his replies to Pettee's suggestions that the letters (in evidence) should be destroyed, and that his (Pettee's) testimony might be damaging, (though he did not understand how it could,) and should, therefore, if possible, be kept out of the case, indicate that he is a man of integrity.

It follows from what has been said that the bill must be dismissed, with costs.