EASTERN DYNAMITE CO. v. KEYSTONE POWDER MFG. CO.

(Circuit Court, M. D. Pennsylvania.   September 1, 1908.)

No. 20, May Term, 1906.

1. PATENTS—ASSIGNMENT—CERTIFIED COPY OF RECORD AS EVIDENCE.

A certified copy of the record of an assignment of a patent with the acknowledgment thereto, although made evidence where the original would be evidence by Rev. St. § 892 (U. S. Comp. St. 1901, p. 673), does not prove the genuineness or due execution of the original assignment, nor is it given such effect by section 4898, as amended by Act March 3, 1897, c. 391, § 5, 29 Stat. 692 (U. S. Comp. St. 1901, p. 3387), which makes a certificate of acknowledgment under seal prima facie evidence of the execution of such an assignment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 280.]

2. SAME — ASSIGNMENT OF FUTURE INVENTIONS—PATENT OFFICE—RECORD—NOTICE.

A written instrument by which an inventor purports to assign all future inventions which may be made by him is not such an instrument as is authorized by statute to be recorded in the patent office, and hence such record, if made, is not notice to a subsequent assignee of a patent obtained by such inventor which will invalidate his title.

3. SAME—INVENTION.

Inventors are not held to the devising of new mechanical forms, or the discovery of hitherto unknown physical principles, but only to the new adaptation and application of those which are already at hand, the question being whether, having regard to what there has been in the past, new and beneficial results have been produced by means not before employed, amounting to inventive advance; and this is not met by evidence that with the new light possessed old devices might possibly be made over to do the same thing.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 31, 32, 55–62.]

4. SAME—RIGHT TO PATENT—ASSISTANCE IN PERFECTING INVENTIONS.

One who has discovered a new principle in a machine does not lose his right as inventor to a patent therefor, because he employs another to put it in working shape, nor because such other may suggest minor features or improvements.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 125.]

5. SAME—INFRINGEMENT—MACHINE FOR PACKING EXPLOSIVE GELATIN.

The Schrader patent, No. 682,390, for a machine for packing explosive gelatin was not anticipated, and discloses invention, although claims 1, 2, 3, 4, and 16 are void as too general and abstract.  The patent also held valid as against the claim that the patentee was not the original inventor, and infringed as to claims 5, 6, 7, and 8.

6. SAME—ATTEMPT TO PATENT OPERATIVE IDEA OR PRINCIPLE.

A mere operative idea or principle cannot be patented, and a mechanical device designed to accomplish certain practical results in the packing of explosive gelatin is therefore confined to the specific means employed for doing so.

7. SAME—"MEANS" OTHERWISE UNSPECIFIED, EXCEPT BY THE FUNCTION TO BE PERFORMED, WHEN NOT ADMISSIBLE.

It is no doubt difficult to define the distinction between a practically operative machine and its function.  And it may be at times permissible to claim as an element of a combination "means," otherwise unspecified, for effecting a certain mechanical result, particularly in inventions of a broad and primary character.  But where, in a device not of that character, the attempt is made to monopolize the abstract result sought to be attained, instead of the concrete mechanism devised for doing so, as,

for instance, in the claims of a patent for a machine for packing explosive gelatin, where, after specifying a packing screw and its case as the first member of the combination declared for, the second member claimed is an "automatically regulated feeding mechanism for variably supplying material to said case in response to variations in the quantity consumed by said screw," and in another claim, after specifying the packing screw and hopper, the other elements are "means for feeding material therefrom to said screw, and means whereby the amount conveyed to said screw will be automatically varied in response to variations in the quantity consumed by said screw," the attempt so made being to indicate or describe the means to be employed solely by the function assigned to it; the claims are bad as the patenting of a principle or function.

8. SAME — FAILURE TO MARK PATENTED ARTICLE — RIGHT TO ACCOUNT FOR INFRINGEMENT AFTER BILL FILED.

Where there is no proof that the patented machine was marked as required by the statute, and issue is made as to this in the answer, notice not being shown to have been otherwise given, the complaint will be confined in the accounting to infringement after the bill was filed, but is entitled to that; the bill itself being notice.

In Equity. Suit for infringement of letters patent No. 682,390 for a machine for packing explosive gelatin, issued September 10, 1901, to J. C. Schrader. On final hearing.

George J. Harding, for complainant.
George R. Hamlin, for defendant.

ARCHBALD, District Judge. The first thing is to settle the complainant's title, which is questioned. By agreement in writing, while the application for the patent in suit was pending, J. C. Schrader, the patentee, covenanted and agreed to assign to the Eastern Dynamite Company, the complainant here, its successor and assigns, the letters patent which had been applied for, when they should be granted, and to execute all necessary and proper papers and do all acts requisite to invest the said company with full title to the invention and patent. Having died before this was complied with, and letters patent having issued to him September 10, 1901, meantime, an assignment of the patent, in conformity with the agreement and of all claims for infringement under it, was duly executed to the complainant by Amelia H. Schrader, his executrix, January 16, 1906, which assignment was forthwith acknowledged, and eventually put on record in the patent office, and is now produced and proved by the subscribing witnesses, due delivery of it being presumed from these circumstances.

Against the prima facie proof of title so made out, the defendants offered in evidence a certified copy of the record in the patent office of a paper purporting to be an agreement, bearing date April 11, 1889, between J. C. Schrader and R. S. Penniman of the one part, and the Repauno Chemical Company, of Wilmington, Del., and the Atlantic Dynamite Company, of San Francisco, Cal., of the other part, a summary of which is reproduced in the margin.[1] This paper, according to

[1] Reciting that, whereas Schrader and Penniman were the owners and patentees of certain patents for explosive compounds or substances—naming such patents—and had also made application for one for the manufacture of dope therefor, and that the second parties were desirous of acquiring an interest in said patents, and in and to all inventions and discoveries which had

the record, was acknowledged before a notary public the same day that it bears date, and was recorded in the patent office December 30, 1890. Objection was made to its admission because it had not been properly proved, and the objection seems to be well taken. No doubt by act of Congress (Rev. St. § 892 [U. S. Comp. St. 1901, p. 673]):

"Written or printed copies of any records, papers or drawings, belonging to the patent office * * * authenticated by the seal, and certified by the commissioner or acting commissioner, shall be evidence in all cases wherein the originals could be evidence."

But this merely dispenses with the production of the record, a certified copy from it being made the equivalent. It does not establish the due execution or genuineness of a paper which happens to be found there, which must still be proved in the usual way. Nor is this affected by the act of March 3, 1897, c. 391, § 5, 29 Stat. 692 (U. S. Comp. St. 1901, p. 3387), which provides that, if any assignment, grant, or conveyance of a patent shall be acknowledged before a notary public, or certain other designated officers, "the certificate of such acknowledgment under the hand and official seal of such notary or other officer, shall be prima facie evidence of the execution of such assignment, grant, or conveyance." An assignment so authenticated does not have to be otherwise proved, as by calling the subscribing witnesses, or by proof of the handwriting of the party who executed it. But the document itself must still be produced, and not a certified copy taken from the record, which in no respect is made a substitute. For the purpose of notice, an assignment of a patent is required to be recorded within three months, and if not so recorded is made void as against a subsequent purchaser or mortgagee for value, without notice. Rev. St. § 4898 (U. S. Comp. St. 1901, p. 3387). But, while constructive notice may be effectively provided for in this way, parties being thereby put upon inquiry, inquiry is by no means excused, nor can the record alone be relied on to make out title, however it may be resorted to, to trace it. No doubt there are authorities entitled to respect which hold otherwise (Dederick v. Agricultural Co. [C. C.] 26 Fed. 763; Natl. Folding Box Co. v. American Paper Pail Co. [C. C.] 55 Fed. 488; Standard Elevator Co. v. Crane Elevator Co., 76 Fed. 767, 22 C. C. A. 549); but not, in my judgment, with reason,

been or should thereafter be made by the said first parties, relating to any and all kinds of explosive compounds and substances containing nitroglycerin, and in the machinery and appliances used or usable in the manufacture of such explosives, whether then patented or not, or for which application might be pending; thereupon, in consideration of $25,000 paid them, the said first parties sold, assigned, conveyed, and set over to the said second parties, their successors, and assigns—to the Repauno Chemical Company an undivided one-third, and to the Atlantic Dynamite Company an undivided two-thirds, in and to the said letters patent, and in and to all claims arising out of the infringement thereof, and also in and to all inventions and discoveries, joint and several, which had been or might thereafter be made by said first parties, relating in any way to explosive compounds and substances, whether patented or not, and in and to all letters patent which could or should be obtained in this or other countries therefor, agreeing for themselves, their heirs. executors, and administrators to execute all necessary papers connected therewith.

164 F.—4

the correct view being the other way (Paine v. Trask, 56 Fed. 233, 5 C. C. A. 497; Mayor v. American Cable Railroad, 60 Fed. 1016, 9 C. C. A. 336). The case is not to be ruled by analogy with the record-·ing of deeds for the alienation of real estate, which depends upon the effect of local statutes, where, as in Pennsylvania for instance, an exemplification of the record is expressly made evidence, "as valid and effectual in law as the original deeds themselves." 1 Brightly's Dig. p. 472, par. 74. Congress might have so provided, but the fact is that it has not done so, and that is the end· of it.

But, even if the agreement here were properly proved, it would not be effectual to overcome the complainant's title. Assuming that an undertaking, such as it was, to assign all inventions and discoveries which should thereafter be made by Schrader and Penniman, in any way relating to explosive compounds and substances containing⸱ nitroglycerin, and to the machinery and appliances used or usable in the manufacture of the same, was broad enough to include a device of the character of that in suit, which is merely a machine for packing explosive gelatin, which may be doubted, and that it is not open to the charge, by reason of its generality, of being a mortgage on future inventive efforts of the parties, which is not favored (Aspinwall Mfg. Co. v. Gill [C. C.] 32 Fed. 697, 700), as it might well be regarded; even so, it was not such an instrument as is covered by the statute, and was not entitled, in consequence, to be put on record, and if not, it conveyed no notice of its terms to the complainant, who thus took title without regard to it. It is well established that the recording of an instrument not provided for by the recording acts conveys no notice. 24 Am. & Eng. Encycl. Law (2d Ed.) 24, 141; Burck v. Taylor, 152 U. S. 634, 14 Sup. Ct. 696, 38 L. Ed. 578; Heister v. Fortner, 2 Bin. (Pa.) 40, 4 Am. Dec. 417. And, no assignment of an unpatented invention being authorized or required to be recorded—unless it be an assignment on which a patent is to directly issue—an agreement to assign a patent not yet obtained is not within the statute, and recording it amounts to nothing. Wright v. Randel (C. C.) 8 Fed. 591, 599; New York Paper Bag Co. v. Union Paper Bag Co. (C. C.) 32 Fed. 783, 788; Regan Vapor Engine Co. v. Pacific Gas Engine Co., 49 Fed. 68, 1 C. C. A. 169. Nor, therefore, is a certified copy of it evidence, even if, contrary to the views above expressed, such copy might be in other cases.

Independent of these considerations, and giving to the copy of the agreement the full force and effect contended for, it is claimed that whatever title or interest was thereby acquired by the Repauno Chemical Company or the Atlantic Dynamite Company is now vested in the complainants by sundry ·mesne conveyances and transfers. But the evidence as to this is not so ·complete as it might be, although not open to some of the objections made to it, which incline to be hypercritical; and I will not therefore go into it. It is sufficient to observe that, for ·the reasons given, the record of the agreement, which·is now sought to be set up as proof of a possible outstanding title in others, was no notice to the complainants of its contents, and interposed no impediment to their taking title, as they did, through the assignment from

the executrix of the patentee, which thus invested them with the full and complete ownership.

This clears the way for the examination of the patent. Explosive gelatin, which it concerns, is put up for use in the form of cartridges about eight inches long and of varying thicknesses, the material being put through a so-called packing machine and turned out from the nozzle in a continuous sausage-like rope, which is cut up and inclosed in waterproof paper bags or skins, for convenience of use and handling. The gelatin has the consistency of putty, with a grain like brown sugar, and in the somewhat primitive type of machine known as the "Sundstrom," extensively employed at the time of the patent, the material was fed intermittently into a rectangular hopper, from the bottom of which it was forced through a nozzle by a horizontally revolving shaft and screw, the gelatin, on account of its sluggish character, being pressed down upon the screw by a platen or plunger, fitted to the hopper, and operated by hand, by a screw and lever, after the manner of the ordinary screw press. There were two serious objections to this, however. In the first place, each time after the hopper had been filled and exhausted, it was necessary to discontinue the operation, raise and remove the plunger—a slow and by no means simple matter—and, having refilled the hopper, resume the process again. And in the next place, owing to the low temperature at which the gelatin explodes, great care had to be exercised lest it should go off, as it easily might, under the heat generated by the pressure or delivery of it by the plunger, beyond the capacity of the packing screw to take. The object of the invention in suit was to obviate these difficulties; the operation being made continuous, the material being fed uninterruptedly into the unobstructed mouth of the hopper as fast as it is taken care of by the packing screw below and the pressure on it being at the same time automatically regulated and relieved by the screw-feed mechanism by which it is delivered. The hopper and packing screw with its nozzle and case are retained, but the hopper is in the form of an inverted cone, having interior converging ribs, within which is a centrally located, revolving, machine-driven shaft, weighted at the top, and provided with sectional blades or paddles, arranged spirally, and set at an angle to the plane of rotation, with a worm at the end, the shaft being rotated in the direction of their highest edge, and being loosely splined in its gears, so as to be free to rise and fall as required. The material being fed regularly into the mouth of the hopper, is carried downwards by the action of the revolving blades, and forced through the nozzle, by the packing screw below, to form a rope. And in case of any accumulation or clogging of the gelatin at the bottom of the hopper beyond the capacity of the packing screw to relieve, the condensation and back pressure so produced cause the blades, by reason of their angularity, to ride on the material, forcing the shaft upwards against the resistance of the weights at the top, which are adjusted to meet normal pressure only, the shaft being free to rise through its gears, and settling back again into place when the pressure is relieved. The delivery of the material is thus lessened and ultimately stopped, if the conditions persist, until

the packing screw is able to keep up with the supply, the continuity of
the operation being preserved and made automatically safe.

That there is nothing to anticipate this in the prior art is clear. The
Sundstrom machine, which it supersedes, after ten or more years of
continuous use, is the only device with which comparison is really to
be made, being not only the best, but in fact the only one, of the kind
which had been so far produced; but it offers nothing with which to
compete. Its crude and primitive character, by contrast, requires but
a glance. The hopper and the packing screw and nozzle, being essen-
tials, are found in both, but are so improved upon and combined with
new and different parts as to revolutionize the whole. Indeed, if there
was nothing more than the change from the slow, complex, and inter-
rupted operation of the one to the simple and continuous operation
of the other, it would be enough to signalize the present device; while

with the added arrangement of feed mechanism, by which the dangerous condensation of the material at the bottom of the hopper above the packing screw is automatically obviated and relieved, the invention is made to stand out as one of decided, if not conspicuous, merit.   By the old and superseded method, after a hopper full of material, laboriously worked down upon the packing screw by hand, by means of the screw press and plunger, had been disposed of, the plunger had to be screwed back to the top, the hinged bar, in which it hung, unlatched, the plunger withdrawn from the hopper, the hopper refilled, the plunger put back, the bar swung down into place and latched, and the process resumed, to be repeated in exactly the same slow way to the end. The touch of the operator also was the only thing relied on to guage the pressure and not let it get too much.   All this, however, is now done away with in the device in suit; the operator having merely to set the machine going, keep it supplied with material, which is readily fed into it from above, and watch the result.

It may be, as contended, that many, if not all, of the different parts of the machine, of similar form, and somewhat similarly, if not suggestively, combined and used, are to be found in various arts; and that, changing a feature here and another there, existing machines, however foreign to their original purpose, could be transformed into something of the kind which we have here. But that is not the test. Inventors are not held to the devising of new mechanical forms, or the discovery of hitherto unknown physical principles, but only to the new adaptation and application of those which are already at hand.· Not that this is not to be desired, if able to be attained, but simply that it is not required.   Neither, in the effort to anticipate, are existing devices to be manipulated and made over at will.   The question is whether, having regard to what there has been in the past, new and beneficial results have been produced by means not before employed, amounting to inventive advance.   And this is not met by evidence that, with the new light possessed, old devices might possibly be made over to do the same thing.   Outside of the immediate art of the patent, the Heilmann Candy Machine, according to the defendant's expert, comes the nearest to being an anticipation, and if that cannot be said of it, it will not be necessary to discuss the rest.   But the most cursory examination of it will suffice to convince that such is not the case.   No doubt it shows a hopper, with a packing ·screw and nozzle below, through which the material is forced, to produce certain forms.   But the material is pressed down upon the packing screw simply by means of a plunger or platen which feeds the hopper and is loaded with a weight suspended on a hinged bar or lever, on which it is movable to increase or lessen the force applied. · This, while not so complicated or cumbersome as the plunger of the Sundstrom, is not much better, and is equally crude.   It is possible that, with some slight modification, an effective machine for the packing of explosive gelatin could be made out of it, but not clearly of the character of that in suit.   It is not enough that both have a hopper with a packing screw and nozzle, where the resemblance practically ends.   The weighted plunger, suspended on its hinged lever bar, to press down the material upon the

packing screw, of the one, permitting at best, as it does, only the intermittent filling of the hopper, and except by dead pressure in no way regulating the feed, has nothing in common, either in form or function, with the revolving shaft of the patent, with its sectional blades, providing for continuous operation, and acting automatically to relieve dangerous congestion of the material above the packing screw. This is the real feature of the invention, although it is not, of course, to be taken out of its setting, and is so distinctive and useful that on it the claim to inventive novelty and the right to a patent may well be made to rest. The Heilmann not having stood the test, it is not necessary, as already intimated, to take up others, no better, if indeed so good. And much less will it be required to consider the numerous references, not offered before the examiner, nor explained by evidence, which were brought in for the first time at the argument, in supposed illustration of the state of the art, of which the court is expected to take judicial notice, as well as to understand, which, if permissible practice, is not to be encouraged.

It is said, however, that even if inventive novelty is shown, Schrader was not entitled to the merit of it, Payne or Sturtevant being the real inventor, one having originally suggested to Schrader the idea of the machine, and the other put into shape that which was so communicated to him. Schrader is dead, and unable to defend his position. But even without the benefit of his assistance, the evidence to the contrary is not of that clear and convincing character which is required to overthrow a patent. Payne's story is that, in 1889, while at work for the Atlantic Dynamite Company as lead burner and all-around mechanic, where Schrader was the general manager, he made drawings for changes in various machines, and among others, so far as he can remember, for the Sundstrom. He fixes the time by the blizzard of 1888, although the connection is not manifest, and his idea, as he says, was to use a perpendicular feed screw, in a round hopper, operating on the same principle as the packing screw, the feed screw shaft to be splined, so as to work up and down through the pulley, and to be held down in place by a hinged pressure-lever and weight at the top. He first brought this, according to his statement, to the notice of Mr. Lunn, who handed the drawings to Mr. R. S. Penniman, and he, in turn, passed them on to Schrader, after which the four met together and had a lengthy conference over them, Schrader, however, not considering them practical. The matter rested in that shape for 10 years, when in May, 1899, about the time that he was leaving the employ of the company to work elsewhere, he again called it to the attention of Schrader, showing him a sketch. This latter date, as we shall presently see, was almost a month after Schrader had taken drawings of his machine, in nearly completed shape, to Sturtevant at the Morris County Machine & Iron Works, so that nothing can be predicated upon any communication at that time, even if it were better substantiated than it is. And as to the earlier one in 1889, there is nothing for it, the same as for the other, but Payne's say-so. Lunn and Penniman, who for all that appears may still be living, are not called to verify it, as they should be, the defendants conceiving that this duty devolves up-

on the complainants, in order to contradict Payne, instead of on them *to corroborate him;* and the drawings, which are now produced by Payne, having been made by him for the occasion to illustrate his testimony. Moreover, not only does Payne qualify his statement, as to what occurred in 1889, in the way already indicated—saying, that, so far as he remembers, he made drawings, etc.—which makes it practically worthless, but, upon cross-examination, he is even less certain, finally declaring that he will not be positive that he *made any such drawings,* or that he submitted them to Lunn and Penniman, and through them to Schrader, unless he has their word for it. It is needless to say that if patents could be upset upon evidence of this character, they would be of little value.

Nor, rightly considered, is the part taken in the invention by Sturtevant more serious. Sturtevant was superintendent of the Morris County Machine & Iron Works, of Dover, N. J., where Schrader lived, and in the spring of 1899, as he testifies, Schrader brought to him at the works two pencil sketches of an improved machine for packing explosive gelatin. He and Schrader, according to his story, had been interested in getting up such a machine, and the drawings expressed Schrader's idea of it, and were turned over to him (Sturtevant) to devise a working machine, which he proceeded to do, the result being shown in certain drawings, in ink and pencil, which have been produced from among the old drawings of the company, and bear evidence of their authenticity, the dates upon them fixing the time as early in April. As the work progressed, Schrader and Sturtevant consulted together over it, Sturtevant submitting to Schrader for criticism his ideas with regard to it. But all the modifications and changes, departing from the original drawings of Schrader, are claimed by Sturtevant to have been of his designing, without suggestion or direction from Schrader, except the general one at the beginning to go ahead and get up a working machine, and except, also, as Schrader requested that some means be devised for cooling the lower part of the hopper, which resulted in the arranging of a water jacket. For all this, however, save only as there may be an incidental corroboration of some of it by the drawings, there is nothing but the unsupported testimony of Sturtevant as to what part of the work was his and what part was Schrader's which, without any intended reflection, the law regards as perilous by itself to destroy a patent (22 Am. & Eng. Encycl. Law [2d Ed.] 331, 332), which is emphasized in the present case; the patentee not being alive to contradict it. What is now claimed by Sturtevant, it may be, if the truth were known should, in fact, be, attributed to Schrader, as the general and controlling features certainly are to be. Admittedly Sturtevant in all that he did was acting for Schrader to carry out and put his ideas into working shape. And while it is no doubt true that where suggestions made by another "go to make up a complete and perfect machine, embracing the substance of all that is embodied in the patent subsequently issued to the party to whom the suggestions were made, the patent is invalid, because the real invention or discovery belonged to another" (Agawam Co. v. Jordan, 7 Wall. 583, 603, 19 L. Ed. 177), where, on the other

hand, "a person has discovered an improved principle in a machine, manufacture, or composition of matter, and employs other persons to assist him in carrying out that principle, and they, in the course of experiments arising from that employment, make valuable discoveries, ancillary to the plan and preconceived design of the employer, such suggested improvements are in general to be regarded as the property of the party who discovered the original improved principle, and may be embodied in his patent as a part of his invention" (page 602 of 7 Wall. [19 L. Ed. 177]). "Common justice," as it is added, "would forbid that any partial aid rendered under such circumstances, during the progress of experiments in perfecting the improvement, should enable the person rendering the aid to appropriate to himself the entire result of the ingenuity and toil of the originator, or put it in the power of any subsequent infringer to defeat the patent, under the plea that the invention was made by the assistant and not the originator of the plan." Page 604 of 7 Wall. (19 L. Ed. 177). These observations apply with pertinence here. Even accepting all that Sturtevant testifies to, the predominant part in the invention clearly belongs to Schrader. A comparison of the drawings, of which he was admittedly the author, with those made up after them by Sturtevant shows that one is a mere amplification of the other, one being in sketch, where the other is in detail. A mouth was added to the hopper by Sturetvant for the convenience of loading, and a hollow shaft suggested to carry the shaft of the packing screw, the driving pulley being mounted on, and the shaft of the packing screw keyed to, it. A water jacket, about the lower part of the hopper, to control the temperature, was also devised at the instance of Schrader, as already stated. But these are incidentals merely, the essentials of the machine, outside of them, being found in the original ideas advanced by Schrader. Not only is the general collocation and arrangement of parts which there appear preserved in the drawings of Sturtevant, following them, but particularly the conical hopper and feed screw to match, with its two sectional blades and revolving shaft arranged to rise through its gear, which, as we have seen, is the feature of the invention. It is contended that Schrader does not show the shaft loosely splined. But Sturtevant does not venture to say this, and defendants' expert admits that it may have been so intended, the only difficulty, as he says, being that the lugs overlapping the gear above and below, which are shown, would conflict with the assembling and dissembling of the parts which, this being a sketch, is not to be taken as controlling. Around the shaft, moreover, is a sleeve carrying the gear, the only purpose of which is to allow of vertical motion, which, even if the rest were less clear than it is, must therefore be taken as provided for. It is also stated by Sturtevant that nothing was said by Schrader as to the shaft being weighted, and that the receptacle for weights, which appear in his (Sturtevant's) drawings, were of his own design, as was the change to the collar and separate weights which are found in the patent. But at the top of the shaft in the Schrader sketch are horizontal lines, which, while somewhat obscure because of being at the extreme edge of the paper, may well be accepted as standing

for this, no other purpose being conceivable for them, and if so, the hopper-like receptacle shown by Sturtevant, as well as the change to collar and weights which was subsequently adopted, is an immaterial variation. More important is it that, except as to its two upper blades, the feed screw in the Schrader sketch extends unbrokenly to the bottom, where in the patent all but the worm at the end are paddles. But even here the use of sectional blades is in part shown by Schrader, being repeated in exactly the same shape in the drawings of Sturtevant, and the extension of this idea, to whomsoever it is attributed, is a mere amplification or improvement, being simply more paddles. Under the most critical examination, therefore, the general plan, as well as the operative principle, of the machine of the patent, is clearly discernible in the drawing submitted by Schrader to Sturtevant, not only in rudiment but in practically completed conception, the work of the latter being merely a perfecting of the mechanical details, not going to the substance of the invention. Undoubtedly the modifications and changes so brought in contribute to the efficiency of the machine, but they do not go to its essence, leaving unaffected the right of Schrader to be considered the original and real inventor.

It is said, however, that machines of the exact form of the patent were subsequently constructed and sold by the Morris County Machine & Iron Works, the whole expense of patterns and everything being borne by them and the machines billed directly to purchasers, Schrader merely selling them and getting a commission, which is inconsistent, as it is urged, with the idea of his being the inventor. But while sales so made may have amounted to a public use, which would have defeated the patent, unless seasonably applied for thereafter, they do not necessarily negative the claim of Schrader to have originated the invention, nor overcome the evidence to that effect already alluded to. Even though machines were constructed from his drawings, after they had been put in shape by Sturtevant, he was none the less the inventor, and he saved his rights by the application for a patent which he subsequently successfully prosecuted. He did not give away his invention, in other words, and much less is it proved that his was not the original conception, because the Morris County Machine & Iron Works were allowed to construct and sell machines patterned after it, for which in each instance, as it is to be observed, it was he who obtained the purchaser. It is testified also by Phillips, the foreman of the shop under Sturtevant, a witness for the defendants, that the company, among other things, built gelatin packing machines for Schrader, and he identifies the drawings which are produced as those by which they were built, which he speaks of as Schrader's gelatin packing machines, the name by which they were evidently known to him; which hardly proves that Schrader was not the inventor of them. Indeed, without dwelling further upon this branch of the case, it may be dismissed with the remark that the evidence produced to refute the claim of Schrader goes the rather to confirm and strengthen it. It certainly does not overcome the presumptions which exist in his favor.

But while the invention itself is thus sustained, as well as the right of Schrader to the merit of it, there are some of the claims of the patent which unfortunately cannot be. The complainants rely on the first, second, third, fourth, fifth, sixth, seventh, eighth, and sixteenth,[1] the first four and the last, as it is said, being generic, and the rest specific. It is the so-called generic claims that do not meet the requirements. They express, it may be, the principle of the machine, or the purpose to be carried out by it, but a mere operative idea or principle cannot of course, be patented. Union Match Co. v. Diamond Match Co. (C. C. A.) 162 Fed. 148. The device here is a mechanical one, designed to accomplish certain practical results in the packing of explosive gelatin, and is necessarily confined to the specific means employed for doing so. This may in a measure be said to be indicated in the claims in question, but not, as it seems to me, to the extent that it should be. For instance, in the first claim, after specifying a packing screw and its case as the

---

[1] "(1) In a machine for packing explosive gelatin the combination with a packing-screw and its case of automatically-regulated feeding mechanism for variably supplying material to said case in response to variations in the quantity consumed by said screw, substantially as described.

(2) In a machine for packing explosive gelatin the combination with a packing-screw and its case of a hopper, means for feeding material therefrom to said screw, and means whereby the amount fed to said screw will be automatically varied in response to variations in the quantity consumed by said screw, substantially as described.

(3) In a machine for packing explosive gelatin the combination with a packing-screw and its case of a hopper, means within the hopper for forcing material therefrom to said screw, and means whereby the pressure upon the material in the hopper will remain constant during the operation of the machine, regardless of the quantity consumed by said screw, substantially as described.

(4) In a machine for packing explosive gelatin the combination with a packing-screw and its case of a hopper, means within the hopper for forcing material to the packing screw, and means for regulating the pressure upon the material, substantially as described.

(5) In a machine for packing explosive gelatin the combination with a packing-screw and its case of a hopper, a vertically-movable shaft suspended therein, horizontal blades carried by said shaft having downwardly-inclined faces, and means for rotating said shaft, substantially as described.

(6) In a machine for packing explosive gelatin the combination with a packing-screw and its case of a hopper, revoluable blades within said hopper having faces angular to their plane of rotation, and means whereby said blades are free to rise during their rotation, substantially as described.

(7) In a machine for packing explosive gelatin the combination with a packing-screw and its case of a hopper, a vertical shaft suspended therein having blades angular to a horizontal plane projecting radially therefrom, said shaft being free to rise in suitable bearings, an adjustable weight on said shaft, and means for revolving said shaft and screw, substantially as described.

(8) In a machine for packing explosive gelatin the combination with a packing-screw and its case of a frame, a hopper, a longitudinally-movable shaft suspended therein, horizontal blades carried by said shaft having downwardly-inclined faces, a gear splined to said shaft supported by said frame, and means for rotating said gear, substantially as described.

(16) In a machine for packing explosive gelatin the combination with a packing-screw and its case of a hopper communicating with said case, horizontally-revoluble blades suspended in said hopper, and adapted to force material therefrom to said screw, and means permitting the automatic rising of said blades when the material offers sufficient resistance to the rotation thereof, substantially as described."

first member of the combination declared for, the second member is an "automatically regulated feeding machanism for variably supplying material to said case in response to variations in the quantity consumed by said screw." This is not a mechanical means, but a function, or rather it is an attempt to indicate the means by the function to be performed by it. It may be the operative principle of the machine, comprising its utility, but the invention cannot be regarded as residing in the discovery of the beneficial principle involved, but in the mechanism by which advantage is had of it. So in the second claim, after specifying the packing screw and hopper, the other elements designated are "means for feeding material therefrom to said screw, and means whereby the amount fed to said screw will be automatically varied in response to variations in the quantity consumed by said screw," which again merely describes the means to be employed by their functions. And the same is true of the other claims, of all of which it may be said that they attempt to monopolize the abstract result sought to be attained instead of the concrete mechanism devised for doing so. It is no doubt difficult to define the distinction between a practically operative mechanism and its function. Paper Bag Patent Case, 210 U. S. 405, 422, 28 Sup. Ct. 748, 52 L. Ed. 1122. And it may be permissible at times to claim, as an element of a combination, "means," otherwise unspecified, for effecting a certain mechanical result, this being particularly the case in inventions of a broad and primary character. But without undertaking to decide just when it may or may not be employed, it is enough to say that, for the reasons given, it is not a sufficient designation here.

The question of infringement remains and must be made out by satisfactory evidence as a part of the complainants' case, irrespective of the effect to be given to the denial in the answer; an answer under oath not having been called for. It comes very near to being admitted, however, in the complaint by the defendants, that a neighbor, the Climax Powder Company of Emporium, Pa., where the defendants' works are located, was allowed for a number of years to use one of these machines, without being interfered with, the defendants, as it is suggested, being thereby led to believe that they could do so also, estopping the complainants from now calling this in question. But without dwelling upon this, or undertaking to discuss the alleged estoppel, which of course cannot be sustained, there is other evidence from which infringement sufficiently appears. On Sunday, September 10, 1905, Mr. R. M. Hunter, the complainants' expert, investigating the subject on their behalf, visited the works of the defendants at Emporium, and saw and made a sketch of a machine which was there set up, and which was, in all respects, of the character described in those claims of the patent which have been declared valid. It is said that the shop to which he went is not sufficiently identified, having been pointed out to him by a young man who is not produced, nor his name given; his declarations with regard to it amounting to hearsay. But on cross-examination Mr. Hunter described the location, with reference to the town of Emporium and its surroundings, of the place to which he was conducted, and if it did not conform to the facts, or

apply to the defendants' works, it was very easy to disprove it, and they would be swift to do so. It is also said that the shop was shut and the works not running, and that although Mr. Hunter could only see the machine imperfectly through the windows, and could not possibly tell how it operated, he has undertaken to describe it in detail, even going so far as to give its interior structure. But according to Mr. Hunter, although outside of the building, he got within a few feet of the machine, and had a front as well as a side view of it, in one position also being able to look down into the hopper and see the blades, and, the nozzle happening to be off, he saw the packing screw and the tubular character of the block which it turned in. His opportunity to observe what he describes would therefore seem to have been ample. The only possible question is whether he could tell that the shaft was loosely splined, so as to be free to rise and fall, which of course is vital. But there was a weight at the top, which had no purpose otherwise, besides which, the shaft extended up through and beyond the gear, and above and below it on the shaft was a groove or keyway for the spline, from which a spline is to be inferred, there being no other use for it. And as was said above, with regard to the identity of the works which Mr. Hunter visited, it was open to the defendants to contradict this evidence, if not true, and show the exact character of the machine which they used, if this does not correctly describe it, which, not having been done, it may well be accepted prima facie.

There was no proof that the complainants' machines were marked as required by the statute, and issue as to this having been made in the answer, and no notice having been shown to have been otherwise given, the right to an account is contested. But the bill was notice, and the complainants do not ask for anything beyond that, and to this at least they would seem to be entitled. American Caramel Co. v. Mills (C. C. A.) 162 Fed. 147.

Let a decree be drawn sustaining the fifth, sixth, seventh, and eighth claims of the patent, but not the others relied on, and holding them infringed, and also awarding an injunction and directing an account, but limiting it to infringement since the filing of the bill, with costs.